STATE OF MAINE
*vs.*
MELVIN W. BECK

Kennebec.    Opinion, October 4, 1960.

*Robert Marden, County Attorney,*
*Jon Lund, Assistant County Attorney,* for State.

*Jerome Daviau,* for defendant.

SITTING: WILLIAMSON, C. J., TAPLEY, SULLIVAN, DUBORD, SIDDALL, JJ. WEBBER, J., did not sit.

SULLIVAN, J. On exceptions. Respondent was prosecuted and found guilty by jury verdict upon a complaint for the offense of appropriating the title of architect by publicly erecting and maintaining upon the building housing his professional quarters a sign with the legend, "Melvin W. Beck, Engineer & Architect," when he had not been registered by the Maine State Board of Architects in compliance with the provisions of R. S. (1954), c. 81.

Respondent at the time of his imputed misdemeanor was a professional engineer registered in accordance with R. S., c. 83.

At the trial it was stipulated that the respondent who was not a registered architect owned the sign and that it had been displayed at his direction. The issues here are of law.

At the close of the evidence respondent unsuccessfully moved for a directed verdict upon the contentions that the State had failed to prove an offense under R. S., c. 81 and that R. S., c. 81 is unconstitutional in not excepting the respondent from its purview and bane. Respondent excepted.

It is obvious that the respondent had violated the mandates of R. S., c. 81 as charged if he were not excepted by that statute. *State* v. *Huff*, 89 Me. 521.

R. S., c. 81, § 9 ordains as follows:

"Nothing in this chapter shall be construed to apply - - - - to any person who is qualified under the law to use the title 'professional engineer' provided that such person may do such architectural work as is incidental to his engineering work - - - -"

The act could hardly have been more oblique in expressing the legislative purpose than it is in the foregoing quotation. Yet a comparison with the complete text of R. S., c. 81 manifests that the law forbids the assumption of the title of practicing architect by one who is not qualified by state registration although he be a registered professional engi-

neer. But the latter may, nevertheless, engage in architecture to the contained extent that such is incidental only to his engineering.

The respondent assails the constitutionality of R. S., c. 81 upon plural grounds. His challenge must satisfy certain familiar norms.

> "The court is bound to assume that, in the passage of any law, the Legislature acted with full knowledge of all constitutional restrictions and intelligently, honestly and discriminatingly decided that they were acting within their constitutional limits and powers. That determination is not to be lightly set aside. It is not enough that the court be of the opinion that had the question been originally submitted to it for decision it might have held the contrary view. The question has been submitted in the first instance to the tribunal designated by the Constitution, the Legislature, and its decision is not to be overturned by the court unless no room is left for rational doubt. All honest and reasonable doubts are to be solved in favor of the constitutionality of the act. This healthy doctrine is recognized as the settled policy of this court. - - - -"

*Laughlin* v. *City of Portland,* 111 Me. 486, 489.

> "The power of the judicial department of the government to prevent the enforcement of a legislative enactment, by declaring it unconstitutional and void, is attended with responsibilities so grave that its exercise is properly confined to statutes that are clearly and conclusively shown to be in conflict with the organic law. - - - -"

*State* v. *Rogers,* 95 Me. 94, 98.

> "- - The burden is upon him who claims that the act is unconstitutional to show its unconstitutionality. Warren v. Norwood, 138 Me. 180 - - - -"

*Baxter* v. *Waterville Sewerage District,* 146 Me. 211, 214.

"- - To invalidate a statute, unconstitutionality must be shown beyond a reasonable doubt. - - -"

*Re: John M. Stanley,* 133 Me. 91, 98.

The particulars of the controverting of the constitutionality of R. S., c. 81 by the respondent may be summarized as follows:

The Legislature distinguishes no efficacious difference between professional engineering and architecture other than the aesthetics of the latter but aesthetics without more are not a proper or adequate object of police power. The act essays to control, by licensing requirements, the practice of art and such the Legislature can not do. The statute is an arbitrary and unwarranted interference with the right of a citizen to pursue a lawful livelihood. More schooling or training is required by the Legislature for professional engineering than for architecture. An architect is basically an engineer with training in art. The respondent's qualifications as a professional engineer are at least the equivalent of an architect's and, notwithstanding, the Legislature discriminates against the former and prevents him from applying art to his profession. If an engineer by the statute is qualified to practice architecture as it may be "incidental to his engineering work," then the stricture against such engineer holding himself out as an architect has no reasonable relationship to the stability of the public health, welfare or safety. The definition of the practice of architecture in R. S., c. 81, § 8 is a hodge-podge of statutory criminality and so vague as to lack that certainty requisite in a criminal law. R. S., c. 81, § 9 violates the principle of equal application of the law in excepting employees who need have no special education or qualifications but who may design a building, provide specifications and supervise construction although the safety of a large segment of the public may be jeopardized. Respondent queries as to how a trained and qualified engineer might endanger the public by

merely advertising that he performs architectural service while an employee without particular qualification may practice architecture without danger to the general public.

R. S., c. 81 as to architects and R. S., c. 83 as to professional engineers are exercises of the police power.

*State* v. *Old Tavern Farm, Inc.,* 133 Me. 468, 470.

The Legislature first regulated by licensing, engineering practice, P. L., 1935, c. 189, and subsequently, architecture, P. L., 1945, c. 356, and must be assumed to have been cognizant of the provisions of P. L., 1935, c. 189 (R. S., c. 83), when it adopted P. L., 1945, c. 356 (R. S., c. 81). The Legislature must be considered as having entertained a consistent design and policy embracing both acts.

*Palmer* v. *Sumner,* 133 Me. 337, 344.

Professional engineering and architecture in the Legislative estimation are patently regarded as separate *species* of the engineering *genus* and such a judgment seems objectively valid. While categorically an engineer, the architect —without disparagement toward the professional engineer—is required to demonstrate that he possesses and utilizes a particular talent in his engineering, to wit, art or aesthetics, not only theoretically but practically, also, in coordination with basic engineering. R. S., c. 81 prescribes that an engineer verify that he has such special talent to a sufficiently cultivated degree before he may publicly solicit patronage as an architect.

Professional engineering and architecture are not mutually separable and can never be completely disassociated. They are overlapping vocations. Nonetheless the Legislature in reason was justified in not regarding them as coextensive but as occasioning individualized attention for the public weal.

In the education of architects Massachusetts Institute of Technology informs us that:

"The prerequisites for the study of architecture are sympathy for human institutions, aesthetic perception, and the ability to utilize effectively the methods of science in arriving at specific solutions of building problems. At bottom perhaps a special 'constructive' aptitude (important for various other careers as well) is, if not actually necessary, extremely desirable. The course of study must provide in different ways for work along various lines — humanistic, artistic, and technical. - - - - In this the elements of function, of structure, and of design in the layman's sense — that is form and expression — are combined and ultimately integrated. Like any other student, the student of architecture must proceed some distance analytically with the study of the separate aspects of his world before he can hope to reach a successful synthesis - - - -"

*Education of Architects and Planners* (M. I. T.) P. 15.

In *Goldschlaz* v. *Deegan,* 238 N. Y. S. 3, 4, the court said:

" - - - But I think it may be safely said that, speaking of to-day, there are many elements of service in the preparation of plans for the construction of a building of whatever type, and the superintendence of construction, that may be more properly left to what we now know as an architect than to what we now know as an engineer. Certainly, an engineer is not to be presumed to be 'one who understands architecture'. - - - -"

In *People* v. *Babcock,* 73 N. W. (2nd) 521, 526 (Mich.), it is said:

"While it is a fact that the definitions of architects and engineers are somewhat similar, yet there is a distinction. The services of an architect require the application of the principles of architective or architectural design, while the services of an en-

gineer require the application of engineering principles."

We quote from *Rabinowitz* v. *Hurwitz - Mintz Furniture Co.,* 133 So. 498, 499 (La.) :

"In the Encyclopedia Britannica we find the following with respect to the profession of engineering:

'Specialization has brought about separate grouping of those interested in mechanical, electrical, mining, etc. engineering. Underlying all groups is the work of the civil engineer, whose field particularly is that of structures. Foundations, simple or extremely complicated, are within his realm. He designs and supervises the construction of bridges and great buildings, tunnels, dams, reservoirs and acqueducts.' From the same work we excerpt the following definition of an architect: 'One who, skilled in the art of architecture designs buildings, determining the disposition of both their interior spaces and exterior masses, together with the structural embellishments of each, and generally supervises their erection.' "

In *McGill* v. *Carlos,* 81 N. E. (2nd) 726, 729, the Ohio Court said:

"Primarily, an architect is a person who plans, sketches and presents the complete details for the erection, enlargement, or alteration of a building or other structure for the use of the contractor or builder when expert knowledge and skill are required in such preparation. The practice of architecture may also include the supervision of construction under such plans and specifications - - - -"

In *Architectural Research: Its Nature and Practice,* by Robert W. McLaughlin, FAIA, Director, School of Architecture, Princeton University (1958), we find the following:

" - - - Man's decision to live in groups in stable locations led to the building of towns and cities. The

ways in which men organize society determine the nature of our cities, and in turn the nature of our cities has a profound effect on the nature of society. An extreme example of this is the slum. *Architecture unrelated to the interests of society produces a slum as soon as it is built.* The study of human ecology, which is concerned with the relation of society to physical environment, and vice versa, holds keys to the understanding of the nature of our cities which can lead to wise planning. The methods and findings of the social scientists are applicable to this area. Urban research, which is architectural research in its widest aspects, leads to principles badly needed for understanding and conditioning the growth and deterioration of cities. - - -

History records man's constant effort to change and improve his environment. He has changed it through building, and improved it through architecture. *He has also damaged his environment through architecture — bad architecture."* (Italics supplied.)

We conclude that, while all architects may be engineers, all engineers are not architects. To restate these truths in one proposition, some engineers are architects. The Legislature confirmed these inferences when in 1945 it made requisite a special and classificational licensing of architects as such and enacted a separate statute for such a purpose in addition to the earlier engineering licensing act of 1935. While the respective functions of an engineer and those of an architect as recited in the two statutes superficially appear parallel and equivalent as predicated for each group they are designedly not so. Notably in the instance of architects studies, plans, specifications, etc., are coupled conjunctively with "a coordination of structural factors concerning the aesthetic." That element is absent from the engineering law. And although the architect licensing act states that it regulates as to the performing of:

" - - - any other service in connection with the designing or supervision of construction of buildings located within the state, regardless of whether such persons are performing any or all of these duties - - -,"

architecture connotes the fulfillment of such duties — which are fundamentally done very well by engineers — in an ulterior manner and with certain finesse not indispensable to the vocation of basic engineering.

It is self-evident from mere definition that the practice of both the professional engineer and the architect directly relate to the public health and welfare.

Architects are commonly engaged to project and supervise the erection of costly residences, schools, hospitals, factories, office and industrial buildings and to plan and contain urban and suburban development. Health, safety, utility, efficiency, stabilization of property values, sociology and psychology are only some of the integrants involved intimately. Banking quarters, commercial office suites, building lobbies, store merchandising salons and display atmospheres, motels, restaurants and hotels eloquently and universally attest the decisive importance in competitive business of architectural science, skill and taste. A synthesis of the utilitarian, the efficient, the economical, the healthful, the alluring and the blandished is often the difference between employment and unemployment, thriving commerce and a low standard of existence. Basic engineering no longer suffices to satisfy many demands of American health, wealth or prosperity.

R. S., c. 81 is necessary to assure the public in these times of expanding and mobile populations that one who publicly offers himself in the role of an architect may evidence his competence by due registration with the State Board.

The classification of architects and that of engineers are:

> " - - - based upon an actual difference in the classes bearing some substantial relation to the public purpose sought to be accomplished by the discrimination in rights and burdens - - -"

*York Harbor Village Corp.* v. *Libby,* 126 Me. 537, 542.

Respondent censures the statute, R. S., c. 81, and contends that it is vitiated by included exceptions which exempt from the requirement of licensing certain kindred and occasional or gratuitous architectural - engineering functions which the Legislature did not deem to be seriously subversive of the objectives of the act. The Legislature judged that the exceptions contained reasonable deterrents or were innocuous. The issue is at most only narrowly debatable and as such is not a sufficient cause for invalidation.

*Heron* v. *Denver* (Colo.), 283, P. (2nd) 647, 650.

R. S., c. 81 and R. S., c. 83 are very advantageous to the professions of architecture and of engineering. They do not discriminate against either vocation but do much to protect and promote each. A professional engineer with architectural competence need only undergo an examination to become registered as an architect.

Incidentally it may be observed that R. S., c. 81, § 9 permits a registered architect to perform any prerogatives of a professional engineer only as it may be "incidental to his architectural work."

The wording of the sign owned and displayed by the respondent was uncontroverted at the trial. Nor was there any occasion to resort to evidence to render its meaning or application clear.

> "The construction of all *written instruments* belongs to the Court. It may become necessary to hear evidence of the surrounding circumstances that fill out the meaning of the words, as well as of

any local or commercial meanings attached to particular words by usage; and the ascertaining of this is for the jury. But, subject to the amplification or the precision of the meaning thus ascertained, it is the duty of the jury to take the construction from the Court - - -"

*Wigmore on Evidence,* 3rd ed., Vol. 1X, § 2556, P. 522.

There was no error in the preclusion of testimony offered by the respondent to prove that he had done architectural work incidental to his engineering. Such evidence would have been extraneous to the issue posed by the State's complaint as to whether or not the respondent, unregistered, had used the title "architect."

"Some acts are in themselves indifferent and become criminal only when done with a particular intent.- - - Other acts, however, are sometimes made unlawful absolutely, without reference to any intent or other state of mind of the doer. In such cases no intent need be alleged or proved. The intent to do is sufficient and that can be inferred from the doing. The acts prohibited by this statute are of the latter class. They are prohibited absolutely. Having intentionally committed them, though innocent of any turpitude, the appellant has violated the statute. State v. Goodenow, 65 Maine, 30."

*State* v. *Huff,* 89 Me. 521, 523.

Respondent excepts to inconsistent statements in the court's instruction to the jury. Such error as there was favored the respondent and is not exceptionable. *State* v. *Siddall,* 125 Me. 463, 464.

*Exceptions overruled.*
*Judgment for the State.*