**Melvin W. BECK et al.**

v.

**CITY OF WATERVILLE.**

Supreme Judicial Court of Maine.

July 20, 1966.

Jerome G. Daviau, Waterville, for plaintiff.

Burton Shiro, Waterville, for defendant.

Before WILLIAMSON, C. J., and WEBBER, TAPLEY, MARDEN, RUDMAN, and DUFRESNE, JJ.

WEBBER, Justice.

After jury verdict for the plaintiffs, defendant appealed from the judgment. Among the stated points of appeal is the assertion of error with respect to the denial of defendant's motion for judgment n. o. v. The decisive issue here is whether or not any enforceable contract was entered into by the parties. As is required in such circumstances we view the evidence in the light most favorable to the plaintiffs.

The defendant city in June, 1960 recognized the necessity of constructing a new high school building. As a means of implementing the program, the Board of Aldermen and Common Council duly adopted Order No. 44 which because of its importance in controlling the issues in this case we quote in full as follows:

"(City of
    Waterville Seal)      June 7, 1960

CITY OF WATERVILLE
IN COMMON COUNCIL

ORDERED, THAT
        the Mayor be and hereby is authorized to appoint an eleven man School Building Committee to supersede the Building Committee appointed under the authority of Order No. 162, December 4, 1956, composed as follows:

No. 1 Mayor
No. 2 Superintendent of Waterville
        Schools
No. 3 City Engineer
No. 4 Four members of City Council
No. 5 One member of School Board
No. 6 Three citizens

for the purpose of approving plans, supervising preparation of specifications,

detailed plans, and bid proposals, accepting bids, overseeing construction under the guidance of a supervising architect of a new 'four year high school', having a thousand pupil capacity, *and to execute any and all contracts necessary for the accomplishment of these objectives within the confines of the scope of the authority granted in this Order.*

Powers and authority of the aforesaid committee shall be subject to the following limitations and conditions:

*No. 1.* The aforesaid new high school shall be constructed upon premises previously purchased by the City of Waterville in the Libby Field-Oak Knoll Drive area.

*No. 2.* The fundamental designed features of the new high school shall—

(a) Be based upon the capacity and curricular needs of a thousand students

(b) Include a cafeteria, gymnasium, and auditorium, and/or a combination gymnasium-auditorium

(c) Be conveniently and economically expandable

*No. 3.* The committee shall immediately procure preliminary sketches of floor plans, perspectives and per square foot cost estimates from several competent architects *at no cost to the city.* (Plans submitted previous to the passage of this Order should also be considered.)

*No. 4.* After consideration of proposed school plans the committee shall recommend acceptance by the City Council of one of the plans, such selection to be made on the basis of the following factors:

(a) Adequacy of design to fulfill curriculum needs of a thousand pupil high school.

(b) Economy of construction costs.

(c) Economy of methods and material of construction.

(d) Long term maintenance costs resulting from general design and materials employed in construction, such as heating, electrical power, janitorial services etc.

*No. 5.* The committee shall recommend an acceptance by the City Council *of an architect* after careful weighing of qualifications, with particular reference to his previous experience, a comparison of his past record of cost estimates, and resulting construction costs, for the purpose of drafting detailed plans, preparing specifications and bid proposals, and to supervise construction. Said architect's fees shall not exceed the sum of five per cent of construction costs. Upon official acceptance of an architect by the City Council the committee *shall then be empowered to enter into a contract for the aforesaid services with the said architect.*

*No. 6.* The committee shall submit the plans and specifications to competitive bid. The bid proposal shall among other requirements, empower the committee to—

(a) Reject any and all bids and any part thereof.

(b) Require performance bonds.

(c) Provide for payments upon architectural performance certificates.

(d) And designate whether the bids shall be submitted on a single contract, multiple contract, or pre-file basis.

*No. 7.* The committee shall be empowered to accept a bid for building construction, the sum of which, including construction costs of the total school plant, referred to in paragraph two, as reflected by the accepted bid, a contingency of five per cent, architectural fees, site development of the immediate surrounding area, shall not exceed $1,400,000.

Any bid exceeding the aforesaid amount shall require the majority approval of both chambers of the City Council. (In determining whether a unit bid for site development shall be accepted, the committee shall compare the unit bid price with the cost of the city performing the equivalent work with its own public works forces.) The committee shall not, however, have the power to accept a bid until it shall have:

(a) Made the bid proposals and bids available for public inspection for a period of at least five days after opening the bids.

(b) Reported to the City Council in joint session the bid the committee anticipates it will accept; responded to any and all inquiries made by members of the City Council in connection with any of the details of the bid proposals and bids, and shall have obtained from the City Council a majority voice vote indicating that the City Council has no further inquiries or comments to be made of the committee.

No. 8. The Committee shall supervise construction; it shall be empowered to approve change orders within the following limitations:

(a) The total of all change orders shall not exceed the amount of five per cent of the accepted construction bid.

(b) No individual change order exceeding the amount of $2500 shall be approved by the committee without the prior approval of the City Council.

(c) All change orders shall be reported to the City Council within thirty (30) days of their approval by the committee.

No. 9. The committee shall submit furnishing requirements to competitive bids; it shall be empowered to accept bids for total furnishing requirements not to exceed the sum of $200,000.

No. 10. The committee shall hold no executive sessions excepting on the invitation and approval of the City Council.

No. 11. The cost of the aforesaid high school plant, including furnishing and fees previously referred to, shall be financed by the sale of the City of Waterville general obligation serial bonds, the maturity of which shall not exceed a period of twenty (20) years. The Special School Finance Committee shall supervise the mechanics procedure, details, and time of the aforesaid bond issue.

(s) Robert M. Thomas
Alderman Ward I"
(Emphasis ours.)

The Mayor appointed a Building Committee which sent invitations to several architectural firms to submit "preliminary layouts, perspectives, per square foot cost estimates to be furnished by the architect *at no cost to the city.*" (Emphasis supplied.) One such invitation was addressed to and received by plaintiff Melvin Beck who responded expressing an interest in the competition. Each such invitation was accompanied by a copy of Order No. 44 and by a copy of a document captioned "Proposal to Secure the Services of an Architect" purporting to delineate the "approximate needs" of the several academic departments. The latter document contained the following language: "The committee will operate within the confines of the scope of the above order. (Order No. 44)." Mr. Beck prepared preliminary plans and sketches as well as a scale model of his proposed building and was afforded an opportunity to make a presentation and explanation of his proposals at a meeting of the Committee. Mr. Beck furnished his cost estimates on his proposed building and indicated that the fee for services would be 5% of actual construction cost. The Committee was unable to agree as to which

**834**

of several architectural firms it would recommend to the City Council for acceptance and voted "to have each of the three architects give a forty-five minute presentation with a fifteen minute question period to the City Government, Tuesday, September 6th." These presentations were given. Mr. Beck informed the members of the City Council that he was a registered engineer and not an architect and that he represented "Melvin W. Beck and Associates", the associates being plaintiffs Haight and Sawyer. The official record shows the result of the meeting in these terms: "Motion was made to take a vote on the choice of an architect. The result was: 12 votes for Beck. 2 votes for Bunker and Savage. 6 votes for Ingalls." No further action was taken looking toward the negotiation of a contract with plaintiffs. On December 6, 1960 the City Council upon being advised by its counsel that the city "could not hire Mr. Beck because he is an engineer and not an architect," took action declaring Order No. 44 to be "invalid" and voted to employ a new architectural firm. The plaintiffs' claim is upon an express contract, for the breach of which they demand their alleged lost profits. The theory upon which the plaintiffs proceed appears to be that Order No. 44 and the proposals of the plaintiffs in response thereto established the terms of an agreement which became effective to bind the parties when the City Council balloted in favor of plaintiffs. With this theory we cannot agree for reasons which will be made to appear.

■ Order No. 44 established an orderly method of procedure to be followed in the performance of a governmental function, the building of a public school. It was not by its very nature and purpose an offer to make a contract with anyone. It provided for the creation of a "School Building Committee", fixed its composition by classes and lodged the power of appointment of those members not otherwise deriving their inclusion by virtue of their public offices. Subject only to certain specifically designated powers of ap-

proval and ratification reserved to the constituting authority, it entrusted to the Committee the usual broad powers of supervision and action which are ordinarily deemed requisite if a building committee is to be effective in performing its tasks. Of vital and controlling importance is the provision empowering the Committee "to execute any and all contracts necessary for the accomplishment of these objectives within the confines of the scope of the authority granted in this order." The Committee was directed to "immediately procure preliminary sketches * * * from several competent architects *at no cost to the city*." (Emphasis ours.) The Committee was to select a plan and an architect for recommendation to the City Council for its acceptance. Specific contracting responsibility was placed in the Committee by the following language: "Upon official acceptance of an architect by the City Council the Committee shall then be empowered *to enter into a contract* for the aforesaid services with the said architect." (Emphasis ours.) Provisions in the order governing proposals for and acceptance of bids on construction and empowering the Committee to supervise construction are not relevant to the issues here.

■ Pursuant to the order and the invitation of the Committee the plaintiffs engaged with other architectural firms in a typical architectural competition. They had actual knowledge of the terms of the order and were bound thereby to know that they were required to pass through certain preliminary stages; that they must first seek a favorable recommendation by the Committee to the City Council and must then obtain the approval of the City Council as being an acceptable "architect" or architectural firm with whom the Committee might properly negotiate a contract. It is significant that when the City Council signified its approval of "Beck" it did so merely by taking a ballot. Here was no formal action to accept an offer made by plaintiffs or to employ them on stated

terms. The act of balloting was entirely consistent with the procedure carefully prescribed in the order and in our view did no more than confer consent and open the door to contract negotiations between the Committee and the plaintiffs. No such negotiations ever took place and no contract was ever made.

Our view in this regard is strengthened by the practical considerations which always should and usually do enter into a municipal undertaking of this magnitude. It was anticipated that construction costs might run as high as $1,400,000 which would necessarily entail architect's fees of many thousands of dollars. Although it is inconceivable that a contract involving such a substantial expenditure of public funds was not intended and expected to be reduced to writing, we recognize that the order did not in terms restrict the authority of the Committee in this regard or prevent it from making an oral contract with the plaintiffs. The order did, however, in express terms recognize the necessity of a contract negotiation involving the Committee and it is apparent that there remained a clear necessity to articulate the mutual duties and obligations of the contracting parties either orally or in writing. To cite only one of a number of things requiring contractual clarification and delineation as between these parties, we turn to the participation of the plaintiff Sawyer. Mr. Sawyer was the only architect among the three plaintiff associates. His services with respect to final plans and the extent of his commitment to supervision of the construction while in progress was a matter of prime importance to the defendant and to the Committee as stewards of public funds. Especially was this so in view of Mr. Beck's clearly stated though inaccurate opinion that an architect and an engineer "are synonymous." See State of Maine v. Beck, (1960) 156 Me. 403, 165 A.2d 433. The associates were not incorporated nor were they partners. They were bound together in a loose *ad hoc* association which left un-

resolved the extent to which one associate could effectively commit the time and talent of another. Mr. Sawyer never appeared before either the Committee or the City Council to make his own commitments. This is but one example of many areas which, though necessarily of vital concern to both contracting parties, were touched upon in preliminary conversations only in the most general terms, if at all. We think that just such considerations and an intention to leave no important issues either unresolved or in a state of ambiguity prompted the inclusion in Order No. 44 of the language empowering the Committee "to enter into a contract" with the selected "architect." The contractual process never proceeded beyond the preliminary stages clearly defined by Order No. 44.

■ As above noted, the plaintiffs were bound by the clear import of Order No. 44. "Our court has been zealous in protecting the rights of property owners from seizure for the debts of the municipality. On numerous occasions the rule has been stated that a person dealing with officers or agents of a municipality *does so at his peril,* and that it is his duty to determine whether the parties with whom he is contracting were authorized to make the contract." (Emphasis ours.) School Dist. # 3 v. M. S. D. C., et al. (1962) 158 Me. 420, 425, 185 A.2d 744, 747.

Although the case was decided on other grounds, the reasoning employed by the Court in Van Buren Light & Power Co. v. Van Buren, (1920) 118 Me. 458, 461, 109 A. 3, is entirely consistent with the result which we reach here. In that case it was voted at town meeting "to contract with the (plaintiff company) for lighting the streets of said [town of] Van Buren village." It was simultaneously voted "to choose a committee of three on behalf and as agents of said town of Van Buren to contract with the (plaintiff company) for lighting the streets of said Van Buren village." The committee was chosen and

executed a contract which was the subject of this action. There is no suggestion that an express contract was created *by the vote of the town* under the circumstances. In this connection the Court said: "But the right of delegating its powers to agents is by the charter now in question limited and restricted. Only the selectmen may be so employed. If the town had made its contract *and by vote settled its terms,* a committee could have been appointed as a mere instrumentality to execute it. *Instead it elected to enter into the contract by agency.* It disregarded the limitation contained in the charter. The contract made by the committee was not binding on the town." (Emphasis ours.)

We think the general rule applicable in such a situation as is here presented is well stated in 38 Am.Jur. 176, Sec. 501, as follows:

"While the contracts of a municipal corporation are ordinarily executed and signed by the mayor or other chief executive officer on behalf of the corporation, it is possible for a contract binding a municipal corporation to be brought into existence by a vote of the municipal council. Thus an ordinance or resolution which is in effect an offer by a municipal corporation, upon acceptance by the party to whom it was addressed, becomes a contract. Similarly, when an offer has been made to a municipal corporation, a vote of the municipal council accepting the offer will constitute a contract. In such a case, the minutes and record of the proceedings of the municipal council constitute a sufficient compliance with the statute of frauds. *Care should be taken, however, to distinguish between the vote of a municipal council consisting in and of itself an offer or acceptance and a vote authorizing the executive officers to enter into a contract. In the latter case, the municipality will not be bound until the executive officers have acted."* (Emphasis supplied.)

In a number of cases courts have had occasion to distinguish carefully between a vote which in and of itself creates the contract and a vote which merely empowers designated agents to negotiate and enter into a contract which will then become the binding obligation of the municipality. In the latter case the vote is deemed to be merely an initiatory or preliminary phase looking toward but not completing a contract.

In finding that a resolution passed at a town meeting did not suffice to create a contract with an architect, the Massachusetts court said in part: "It (the resolution) is bare of any indication of conditions upon which the plaintiff was willing to be employed. The vote is equally devoid of any expression of the terms of an agreement or of any indication of a concluded bargain. No obligations were set forth and no duties were stated. The adoption of the plan sketched by him was no more than an initiatory step, signifying an intention. Whether that intention would ripen into a meeting of minds between the parties upon the essential features of a contract rested wholly upon the uncertainties of the future." Vinal v. Inhabs. of Nahant (1919), 232 Mass. 412, 122 N.E. 295, 296.

Where a city council voted "that the city solicitor * * * be empowered to sell (land) * * * (to the plaintiff) for a sum not more or less than nine hundred ($900) dollars", this being the amount offered in writing by the plaintiff, which vote was rescinded without any action having been taken by the city solicitor, held there was no enforceable contract. The court held that the city council's order was only a preliminary step in the negotiations and merely empowered the city solicitor to contract on behalf of the defendant (city), and did not in itself constitute an acceptance of the plaintiff's offer. Al's Lunch, Inc. v. City of Revere (1949), 324 Mass. 472, 87 N.E.2d 5. See also Benton v. Springfield YMCA (1898), 170 Mass. 534, 49

N.E. 928; Madden v. City of Boston (1901), 177 Mass. 350, 58 N.E. 1024.

Applying the same principle where the vote was claimed to be the acceptance of an offer to make a contract, but the defendant was other than a municipality, the court in Salvation Army, Inc. v. E. R. Wilcox Post No. 16 (1916), 225 Mass. 136, 114 N.E. 60, said in part: "The vote does not purport by its terms to be an acceptance of the plaintiff's offer so as to bring into being 'an agreement which creates an obligation.' In form it is a direction to the president of the defendant post to enter into a contract under the conditions there specified and not of itself a vote by which the post entered into a contract. We are of opinion that by the true construction of it the vote was what in form it purports to be, namely, an initiatory step directing the president to make a contract and (as we have said) not an act by which the post made a contract. * * * But the same reasons which are decisive against its being an acceptance of the plaintiff's offer are decisive against its being an offer on the part of the defendant, namely it was an initiatory step which would ripen into a contract when the president, acting under it, made the purchase he was thereby directed to make."

We have but to substitute the names of the parties and the words "Building Committee" for "president" and "contract" for "purchase" and the above quoted language becomes directly applicable in the instant case.

Looman Realty Corp. v. Broad St. Nat. Bank (1962), 74 N.J.Super. 71, 180 A.2d 524 (cert. den. 37 N.J. 520, 181 A.2d 782).

"It is impossible for us to hold that the resolution (by plaintiff city) above quoted operates as a contract. It is nothing more than a power of attorney to the mayor to enter into a contract; and as he did not act under the power, and no steps were ever taken to compel him to do so, the contract was never made, and does not exist." City of Baltimore v. City of New Orleans (1893), 45 La.Ann. 526, 12 So. 878, 880.

For the reasons stated the plaintiffs have failed in their effort to prove the breach of an express contract. We do not understand that they press any sort of claim based upon an implied contract. In any event none of the essential elements of a cause predicated upon the breach of an implied contract are here shown. There was no official action by any authorized body requesting or consenting to any activities on the part of the plaintiffs aside from those which by the express terms of the invitation were to be furnished at no cost to the defendant. The defendant has not had the benefit of any services rendered at its request or with its consent. The plaintiffs have assigned no value to services, if any there be, claimed to have been rendered, but have adhered strictly to their claim of lost profits arising from alleged breach of an express contract.

We conclude that the defendant was entitled to favorable action upon its motion for a directed verdict made at the close of all of the evidence. This right was preserved by a seasonable motion for judgment n. o. v. The entry will be

Appeal sustained. Judgment for the defendant notwithstanding the verdict.