J/S -10

STATE OF MAINE                          BUSINESS AND CONSUMER DOCKET
SAGADAHOC, ss.                          Location:  West Bath
                                        Docket No.  BCD-WB-AP-09-31


PIKE INDUSTRIES, INC.,

                    Plaintiff

v.                                      ORDER ON MOTION FOR ENTRY
                                        OF CONSENT DECREE

CITY OF WESTBROOK, et al.,

                    Defendants


Before the Court is the motion of defendant City of Westbrook ("Westbrook") for Entry of a Consent Order between Westbrook, plaintiff Pike Industries, Inc. ("Pike"), and intervenor IDEXX Laboratories, Inc. (IDEXX).  The motion is opposed by Intervenors Artel, Inc. ("Artel") and Smiling Hill Farm, Inc.  The court held a hearing on the motion on November 9, 2010.

## BACKGROUND

### I.    Procedural History

In bringing this case, Pike joined an administrative appeal of governmental action, pursuant to M.R. Civ. P. 80B, with independent claims for equitable estoppel, waiver, and laches, pursuant to M.R. Civ. P. 80B(i) and 14 M.R.S. §§ 5951-63 (2009).  On April 5, 2010, this court rendered a decision on Pike's 80B claim and affirmed the decision of the Westbrook Zoning Board of Appeals.  Still pending are Pike's independent claims for equitable relief.

Prior to trial on these independent claims, Pike, Westbrook, and IDEXX negotiated and presented a proposed Consent Order to the court.  The court continued the trial in order to consider and conduct a hearing on the City's motion for entry of the Consent Order.

II.     Terms and Effect of the Proposed Consent Order

The proposed Consent Order, if accepted by the court, would resolve Pike's remaining equitable claims, release the settling parties from liability from the suit, and prohibit the parties from litigating further issues related to the suit other than those specified within the agreement. (Consent Order ¶¶ 9-12.) Once effective, Pike also would dismiss a separate pending Rule 80B proceeding, not before this court, and could then re-commence quarrying activity at the Spring Street Quarry, but subject to conditions and restrictions set forth in the Consent Order. (Consent Order ¶ 12.)

A.      Performance Standards

The Consent Order contains numerous and detailed performance standards, prescribing the areas where and the method by which Pike will be able to continue its mining operation. Under the terms of the proposed order, Westbrook cannot require Pike "to comply with or implement any performance standards, management practices or site improvements except as provided [in the consent agreement]." (Consent Order ¶ 53.) Pike would not be able to operate quarrying activities west of Clarke Brook, nor operate an asphalt or concrete plant, and these restrictions would be permanently impressed upon Pike's property. (Consent Order ¶ 16-17.) Pike would also be required to construct a visual buffer, vegetative buffer, and fence and not allow dust to cross its property line. (Consent Order ¶¶ 22-23, 44.) The hours permitted for crushing would be limited to weekdays 7:00 a.m. – 6:00 p.m.; the hours permitted for trucking limited to weekdays 7:00 a.m. to 5:00 p.m. and Saturdays 7:00 a.m. – 12:00 p.m.; and the amount of truck traffic limited to an average of 45 departures in a single day, calculated annually. (Consent Order ¶¶ 18, 20. The hours permitted for blasting would be limited to weekdays 10:00 a.m. – 3:00 p.m. (Consent Order ¶ 18.) Pike could only conduct 8 production

2

blasts a year, and, if any blasting is necessary for safety, those blasts must be coordinated with production blasts. (Consent Order ¶ 19.)

Further, within the first 6 months of the order, Pike must relocate the quarry entrance and construct a new access road and may conduct up to 10 blasts to accomplish these requirements. (Consent Order, ¶¶ 19, 33-34.) Pike also would be required to "meet with Artel and negotiate in good faith as to any other blasting limitations during [those first 6 months] as are commercially reasonable for Pike to minimize any unreasonable disruption to Artel's on-going business operations." (Consent Order ¶ 19.) In addition, Pike must comply with all current and future blasting permit requirements of the Westbrook Code and conduct all blasting and related operations according to applicable safety standards pursuant to federal, state, and local law. (Consent Order ¶ 19.) Pike must coordinate with the Maine Department of Environmental Protection for investigation and monitoring of its activities and have a third party conduct blast monitoring, off-site seismic monitoring, and pre-blast surveys. (Consent Order ¶ 24-27.) Finally, Pike must limit vibrations through the use of electronic detonators and laser profiling (Consent Order ¶¶ 35-37), maintain decibels below prescribed levels measured at the property line (Consent Order ¶¶ 39-43), and maintain a blast call list of property owners within ½ mile of the quarry to notify them two weeks in advance of any blasting (Consent Order ¶ 30).

B.    Prospective Application and Dispute Resolution

The proposed Consent Order provides that it "is intended to and will supersede and control over any different or conflicting provisions of the Westbrook Code of Ordinances now existing or hereafter enacted," and "[i]n the event of a difference or conflict between the terms of this Order and any state or federal requirements, the stricter provision will control and this Order will otherwise remain in full force and effect." (Consent Order ¶ 56.) The agreement, and thus

3

the order, would be binding upon and inure to the benefit of the parties' successors and assigns and contains a re-opener provision that allows the parties to discuss and negotiate in good faith the incorporation of improved mining technologies once every 10 years. (Consent Order ¶ 56.) If the parties do not come to an agreement, the then-current terms of the agreement will continue for another 10 years. (Consent Order ¶ 56.) If a dispute arises between the parties regarding the Consent Order, it shall first be subject to informal negotiations, and then Westbrook may enforce violations pursuant to 30-A M.R.S. § 4452 (2009). (Consent Order ¶¶ 57-58.)

## DISCUSSION

As a matter of policy, our system and rules encourage the settlement of disputes, particularly agreements that parties have arrived at without court intervention. *See* M.R. Civ. P. 92; M.R. Evid. 408; *Bennett v. Forman*, 675 A.2d 104, 106 (Me. 1996); *cf. Bennett v. Bennett*, 587 A.2d 463, 464 (Me. 1991). "A consent decree is primarily a means by which parties settle their disputes without having to bear the financial and other costs of litigating." *Butler v. D/Wave Seafood*, 2002 ME 41, ¶ 13, 791 A.2d 928, 931 (quoting *Local No. 93, Int'l Assoc. of Firefighters, AFL-CIO, C. L. C. v. City of Cleveland*, 478 U.S. 501, 528 (1986)). Consent decrees have attributes of both contracts, in that their terms are arrived at through mutual agreement of the parties, and judicial decrees, in that the decree is an enforceable as a judgment. *See Local No. 93*, 478 U.S. at 519-24. Nevertheless, the court has only a limited role in reviewing consent decrees, including, among other things, ensuring the parties' actual consent to the agreement and the agreement's lawfulness. *See id.* at 522-26.

## I. Consent of the Parties and Its Effect on Intervenors

There is no indication that the parties to the consent decree have not willfully consented to the agreement's terms. The fact that Intervenors Artel and Smiling Hill object to the decree in

4

and of itself, does not prevent the court from considering or approving the proposed Consent Order. The Law Court addressed this issue in *Butler*, where KeyBank, an intervenor in that case, argued that the court's "approval of the principal parties' settlement over KeyBank's objection created irreparable harm to the interest it sought to protect through intervention." 2002 ME 41, ¶ 13, 791 A.2d at 931. The Law Court, quoting the United States Supreme Court, stated:

> It has never been supposed that one party—whether an original party, a party that was joined later, or an intervenor—could preclude other parties from settling their own disputes and thereby withdrawing from litigation. Thus, while an intervenor is entitled to present evidence and have its objections heard at the hearings on whether to approve a consent decree, it does not have the power to block the decree merely by withholding its consent.

*Id.* (quoting *Local Number 93*, 478 U.S. at 529). "The settlement cannot, however, serve to dispose of an intervenor's valid claim," *see id.*, or "impose duties or obligations on a third party, without that party's agreement," *see Local No. 93*, 478 U.S. at 529.

Both Artel and Smiling Hill ably presented their objections at the November 9, 2010, hearing on Westbrook's motion in this matter. Because neither Artel nor Smiling Hill brought any independent claims against Westbrook or Pike, the court's approval of the proposed Consent Order would not dispose of any valid claims those intervenors might have. The court thus is satisfied that the parties to the proposed Consent Order have in fact consented to the agreement and that adoption of the order would not dispose any present or future rights of Artel and Smiling Hill.[1]

---

[1] In their briefs, Artel and Smiling Hill also suggest that the agreement must be fair, and Artel contends the proposed Consent Order is procedurally unfair because Artel is not a party to the agreement and therefore would have no rights to enforce the resulting judgment. The Intervenors' objections to the procedural unfairness are addressed in the discussion above. Both Artel and Smiling Hill presented their objections at the hearing, and the settlement does not dispose of any valid claim they might have.

As between the parties to the agreement, the proposed Consent Order is a fair compromise of Pike's equitable claims. Were Pike to succeed at trial, Westbrook could be equitably estopped from enforcing its

II.    Lawfulness of the Consent Decree

The Intervenors, through written and oral argument, contend that the proposed Consent Order is unlawful because it is beyond the authority of the City Council to enter into an agreement with Pike and IDEXX that: 1) unlawfully ties the hands of future City Councils, 2) constitutes *de facto* contract rezoning without the appropriate administrative and legislative process required by statute and Westbrook's zoning ordinance, and 3) constitutes a more comprehensive outcome than Westbrook could have otherwise achieved had the parties engaged in formal contract zoning procedure.  (Artel's Opp'n Memo. 10-13.)  The Intervenors also contend that if the court were to approve the Consent Order, its judgment would constitute impermissible "judicial rezoning."

A.    Prospective Application

Artel objects to the provision of the proposed Consent Order that supersedes and controls over "any different or conflicting provisions of the Westbrook Code of Ordinances now existing or hereafter enacted" and the 10-year re-opener provision  (Artel's Opp'n Memo. 10-11; Proposed Consent Order ¶ 56.)  In support of its argument, Artel cites *Frew v. Hawkins*, 540 U.S. 431 (2004), and *Horne v. Flores*, 129 S. Ct. 2579 (2009), which were class actions alleging violations of federal law by state agencies.  The court finds these decisions distinguishable from the instant case.  The fundamental concern of the United States Supreme Court in *Frew* and *Horne* centered on issues of federalism—federal court control over state functions—that are not

---

zoning ordinance against Pike and Pike could extract minerals and crush stone at will. Were Westbrook to be successful at trial, Pike could lose all ability to mine or crush on its property. The proposed Consent Order falls between those two potential results.

6

present here.[2]  Further, Maine's Law Court has indicated that the binding effect of municipal action is not the appropriate inquiry; the appropriate inquiry is the authority of the municipal body to engage in the challenged activity:

> While the personnel of a city government may change, the tribunal itself is a continuous body. . . . While one city government composed of one set of individuals might, upon a given question, do precisely the reverse of another city government, composed of a different set of individuals, yet, what the individuals of different city governments might do, can in no way affect the right of the tribunal as a city government to act upon any measure properly before it.  What the individuals may do, as a matter of opinion is one thing, but what the tribunal, a perpetual body is empowered to do as a matter of authority, is quite another thing.

*City of Biddeford v. Yates*, 104 Me. 506, 515, 72 A. 335, 339 (1908).  The non-consenting intervenors, correctly, do not suggest that the Westbrook City Council lacks any authority to settle litigation.  The Legislature has granted municipalities the right to sue and be sued.  *See* 30-A M.R.S. § 2002 (2009).  An attendant right to engage in litigation is the right to settle legitimate disputes.  *See Multnomah County v. Title Guar. Co.*, 80 P. 409, 411-12 (Or. 1905) (concluding that a county may settle a disputed claim of the amount owed on tax certificates as inherent in their right to sue and be sued as long as it is in the best interests of the county); *Mayo v. Dover & Foxcroft Village Fire Co.*, 96 Me. 539, 551, 53 A.62, 66 (1902) ("[M]unicipal corporations can

---

[2]  In *Frew*, the Supreme Court held that enforcement of a consent decree between mothers and officials in the Texas Department of Health and the Texas Health and Human Services Commission for violations of the Medicaid did not violate the Eleventh Amendment, but also commented on "the sovereign interest and accountability of state governments" and the risk of depriving state officials of the designated powers through long-term federal court oversight of state programs absent an ongoing violation of federal law.  *See* 540 U.S. at 433-34, 441. The Court expressed similar concerns in *Horne v. Flores*, 129 S. Ct. 2579 (2009), a declaratory judgment action by a group of English Language Learner students and their parents against a school district in Arizona for violation of the Equal Educational Opportunities Act of 1974 (EEOA). *Id.* at 2588.

In both cases, the Court concluded that that these concerns could be addressed through a flexible approach to the modification of consent decrees when changed circumstances warrant amendment through the court's equitable powers. *See id.* at 2600; *Frew*, 540 U.S. at 436; *see also* Fed. R. Civ. P. 60(b).

not only exercise such powers as are granted by their charters, or by general law, either expressly or by implication, but also such as are incidental to the powers expressly granted and such as are essential to the objects and purposes of the corporation."). The terms of the proposed Consent Order allow the parties to reopen the decree in 10 years for changes that "shall respect the balance struck in the Consent Agreement between the commercially viable operation of the Quarry and mitigation of negative effects on surrounding properties and the environment." (Proposed Consent Order ¶ 56.) Finally, in addition to the re-opener provision, the parties acknowledge that should the court approve the Consent Order, it will be incorporated as a judgment and subject to a motion for relief from judgment pursuant to M.R. Civ. P. 60(b). Because the City Council of Westbrook has the authority to settle litigation,[3] the court is not persuaded that the binding effect of the Consent Order invalidates the whole.

B.    *De Facto* Contract Zoning

Artel and Smiling Hill's second argument is that the Consent Order is tantamount to contract rezoning and unlawful because the procedures and standards mandated by state and municipal law have not been met. (Artel's Opp'n Memo. 11-13.) They suggest that the proper procedure is for Pike to dismiss its suit and apply for a contract zone to the Westbrook Planning Board so that notice and due process requirements can be met.

---

[3]    Article VIII, Part Second, Section 1 of Maine's Constitution provides: "The inhabitants of any municipality shall have the power to alter and amend their charters on all matters, not prohibited by Constitution or general law, which are local and municipal in character. The Legislature shall prescribe the procedure by which the municipality may so act." The court takes judicial notice of the City of Westbrook's Charter, which provides: "The city council shall, so far as not inconsistent with the act, have and exercise all the legislative powers of towns, and have all the powers and be subject to all the liabilities of the city councils, and either branch thereof under the general laws of this state." Westbrook, Me., Charter § 12 (Sept. 13, 2010). "When no specific provision in a city charter exists in reference to the existence of a municipal power, the city has all the powers granted to towns or municipalities under the general law." 30-A M.R.S. § 2004 (2009).

8

By statute, municipalities may engage in contract or conditional zoning, provided that certain statutory requirements are met. *See* 30-A M.R.S. § 4352(8) (2009).[4] Contract zoning, like all zoning, is a legislative act. *See Bog Lake Co. v. Town of Northfield*, 2008 ME 37, ¶ 11, 942 A.2d 700, 704. Westbrook's land use ordinances allow contract zoning

> where, for such reasons as the unusual nature or unique location of the development proposed, the City Council finds it necessary or appropriate to impose . . . certain conditions or restrictions relating to the physical development or operation of the property, which are not generally applicable to other properties similarly zoned. All rezoning under this section shall establish rezoned areas, which are consistent with the existing and permitted uses within the original zones. All such rezoning shall be consistent with the City's Comprehensive Plan.

Westbrook, Me., Land Use Ordinance § 107(B) (Dec. 8, 2008); *accord* 30-A M.R.S. § 4352(8). An applicant for contract zoning in Westbrook must submit an application to the Westbrook Planning Board that includes, among other things, a plot plan, "a detailed statement of the proposed use of the property," and "a statement setting forth the precise zoning change requested." Westbrook, Me., Land Use Ordinance § 107(A)(1) through (A)(3) (Dec. 8, 2008). Before any property may be rezoned, both the Planning Board and City Council must conduct a public hearing and provide at least 13 days notice of the hearing through posting and publication. Westbrook, Me., Land Use Ordinance § 107(C), (C)(1) (Dec. 8, 2008); *accord* 30-A M.R.S. § 4352(8).

---

[4] Title 30-A M.R.S. § 4352(8) provides:

> **8. Conditional And Contract Rezoning.** A zoning ordinance may include provisions for conditional or contract zoning. All rezoning under this subsection must:
>
> **A.** Be consistent with the growth management program adopted under this chapter;
>
> **B.** Establish rezoned areas that are consistent with the existing and permitted uses within the original zones; and
>
> **C.** Only include conditions and restrictions that relate to the physical development or operation of the property.

9

In some ways, the effect of the proposed Consent Order resembles contract zoning. The Consent Order imposes restrictions on the development and operation of Pike's property that are not applicable to any other property similarly zoned. The litany of performance standards of the agreement all relate to the operation of Pike's mining activities, incorporating provisions for when, where, and how Pike may crush, blast, and truck on its property. Artel correctly points out that although the City Council conducted public hearings before approving the Consent Order, there were no hearings before the Planning Board, as would have been required by 30-A M.R.S. § 4352(8) and section 107(C) of Westbrook's Land Use Ordinance. Further, there has been no determination, by the City Council or otherwise, that the uses embodied in the Consent Order are consistent with Westbrook's Comprehensive Plan. The court is also cognizant of the Law Court's admonishment that a municipality may not circumvent statutorily mandated zoning procedures through the exercise of its home rule authority. *See Perkins v. Town of Ogunquit*, 1998 ME 42, ¶ 15, 709 A.2d 106, 110 (holding that a Planning Board may not grant a variance through use of a waiver ordinance because variances must be obtained by the Zoning Board of Appeals).

Despite its ostensible resemblance to contract zoning, the court is convinced that the proposed Consent Decree is not in fact an instance of contract or conditional zoning or an attempt by Westbrook to avoid the legislative process. Artel and Smiling Hill misapprehend the nature of Pike's pending claims and the different structural roles that the City Council has in Westbrook's municipal government. The proposed consent decree before the court is the settlement of legitimate *equitable* claims that the parties have disputed through litigation. Whether Westbrook is equitably estopped from enforcing its zoning ordinance against Pike's quarrying and mining operation or whether the doctrine of laches applies are determinations that

10

the court must make. *See* M.R. Civ. P. 80B(i); *Salisbury v. Town of Bar Harbor*, 2002 ME 13, ¶ 16, 788 A.2d 598, 602. The "[p]roper application of the doctrine of equitable estoppel rests on the factual determination that the declaration or acts relied upon must have induced the party seeking to enforce the estoppel to do what resulted to his detriment, and what he would not otherwise have done." *City of Auburn v. Desgrosseilliers*, 578 A.2d 712, 714 (Me. 1990) (quotation marks omitted). If a party challenging the enforcement of a zoning ordinance by a municipality can establish these facts and the equities weigh in the party's favor, the municipality will be equitably estopped from enforcing the zoning ordinance. *See id.* at 715. "Laches is an omission to assert a right for an unreasonable and unexplained period of time under circumstances prejudicial to the adverse party," and application of the doctrine by the court is fact-dependent. *See Town of Falmouth v. Long*, 578 A.2d 1168, 1170 (Me. 1990). These equitable doctrines apply despite the facial and legal validity of a zoning ordinance. *See Desgroseilliers*, 578 A.2d at 714; *Long*, 578 A.2d at 1170.

The City Council, as Westbrook's governing body, has both legislative and executive powers. *See* 2A McQuillin, *The Law of Municipal Corporations* §§ 10.6-10.7 (3d ed. 2006 & Supp. 2010); *cf. Diva's, Inc. v. City of Bangor*, 411 F.3d 30, 41 (1st Cir. 2005) ("City Council members at various times may perform legislative, executive and judicial functions" (quotation marks omitted)). When the City Council creates or adopts new laws or ordinances of general application, including zoning ordinances, it acts in a legislative capacity. *See* 30-A M.R.S. § 4352 (2009); *Bog Lake Co.*, 2008 ME 37, ¶ 11, 942 A.2d at 704. When the City Council, however, votes to enter into a waste removal contract, approves the hiring of a new code enforcement officer, or enters into a settlement agreement of legitimate claims in pending litigation, it acts in an executive capacity, pursuant to the broad powers of administration granted

11

to municipalities by the Maine Constitution's home rule authority for matters which are local and municipal in character. *See* Me. Const. art. VIII, pt. 2, § 1; 30-A M.R.S. § 2601-A (2009); *Bird v. Old Orchard Beach*, 426 A.2d 370, 372 (Me. 1981); *Beck v. Waterville*, 221 A.2d 831, 836 (Me. 1966). The City Council's decision and vote to enter into the Consent decree is executive, not legislative in nature and, therefore, it does not constitute contract zoning, illegal or otherwise.

Finally, the court is concerned with the practical consequences of the procedure advanced by Artel and Smiling Hill: that Pike should dismiss the suit and apply for contract zoning. The logical conclusion of their preferred procedure would prevent a municipality from settling any land use litigation involving a statutorily mandated process, regardless of the risks or costs to the municipality. In the present case, such a procedure may well be an exercise in futility because a determination of whether the Westbrook Planning Board and City Council would approve a contract zone in favor of Pike does not address Pike's independent equitable claims that it has a right to quarry its property. In the context of the litigation of Pike's independent claims, the court believes that the procedure advanced by Artel is neither necessary, nor intended by the Legislature. Any procedural due process requirement about notice and the opportunity to be heard regarding the proposed settlement can be satisfied, as they are here, by the governing body holding a public hearing on the matter prior to its vote. Prior to approving the Consent Order, the City Council conducted multiple public hearings at which Artel and other residents were able to voice their objections. The court is satisfied that due process requirements have been met.

Because the City Council has the power to settle claims, as attendant to the right granted to municipalities by the Legislature to sue and be sued, *see* 30-A M.R.S. § 2002, and because opponents were provided with notice and the opportunity to be heard, the court will not second

12

guess the Council's judgment that it is in the City's best interest to settle the litigation with Pike rather than risk an adverse result after trial. *See Butler*, 2002 ME 41, ¶ 13, 791 at 931.

C.    Scope of Relief

During the hearing on this matter, Artel argued that the proposed Consent Order is unlawful because it affords Westbrook a more comprehensive outcome and greater relief than it would have otherwise been able to achieve had Pike engaged in formal application for a contract zone. While it is true that the proposed Consent Order encompasses terms in favor of the City and its residents that would not have been available pursuant to a contract zone,[5] Artel again misapprehends the City Council's executive role in entering into the agreement and the court's role in reviewing it. Westbrook and Pike, in settling this litigation, may include terms in their agreement that the court could not order, provided those terms are not unlawful. Notwithstanding their contract zoning argument, neither Artel nor Smiling Hill identified any terms of the proposed Consent Order that that were contrary to the demands of Westbrook's municipal ordinances.[6] Simply because the relief within the Consent Order is more than the court might grant does not render the agreement unlawful. *Cf. Local No. 93*, 478 U.S. at 525-26 (explaining that a court may enter a consent decree that provides for broader relief than a court could have awarded after trial as long as it is consistent with the law upon which the complaint is based and not unlawful).

---

[5] For example, the provisions mandating that Pike maintain a blast call list and work with Artel during the first 6 months when Pike is relocating its entrance are not "conditions or restrictions relating to the physical development or operation of the property." *See* Westbrook, Me., Land Use Ordinance § 107(B) (Dec. 8, 2008). (Consent Order ¶¶ 19, 30.)

[6] The proposed Consent Order already provides: "In the event of a difference or conflict between the terms of this Order and any state or federal requirements, the stricter provision will control and the Order will otherwise remain in full force and effect." (Consent Order ¶ 56.)

13

D.     "Judicial Rezoning"

As noted, our system and rules encourage the settlement of disputes, particularly agreements that the parties have arrived at without court intervention. The proposed Consent Order, however, is not just the settlement of a private dispute between parties. The parties have asked the court to incorporate their agreement into a judgment, thereby implicating the integrity of the judicial branch and the doctrine of separation of powers. Artel and Smiling Hill contend that the court may not enter the proposed Consent Order as a judgment because it would constitute "judicial rezoning."

Maine courts have not addressed the concept of judicial rezoning, but other jurisdictions have held that the phrase refers to a court usurping the legislative function and improperly rezoning a parcel from one zoning classification to another. *See, e.g., City of Batesville v. Grace*, 534 S.W.2d 224, 228-29 (Ark. 1974); *Cosmopolitan Nat'l Bank v. County of Cook*, 469 N.E.2d 183, 194 (Ill. 1984); *Schwartz v. City of Flint*, 395 N.W.2d 678, 682-83 (Mich. 1986); *Suffolk Housing Svcs. v. Town of Brookhaven*, 511 N.E.2d 67, 70 (N.Y. 1987); *Union Oil Co. of Cal. v. City of Worthington*, 405 N.E. 2d 277, 280 (Ohio 1980). It is a usurpation of the legislative function because, instead of adjudicating whether or not a zoning ordinance or amendment is within the authority of the municipality to adopt, the court makes an independent determination regarding the use of a parcel and purports to assign a zoning designation to the property based on that determination. Courts are not constitutionally or institutionally competent to make those determinations. Because the prohibition on judicial rezoning is in accord with the standard of review in Maine for addressing the consistency between a zoning ordinance and a town's comprehensive plan, *see LaBonta v. City of Waterville*, 528 A.2d 1262, 1265 (Me. 1987) ("the

14

court will not substitute [its] judgment for that of the duly elected legislative body" (quotation marks omitted)), the court concludes that "judicial rezoning" is prohibited in Maine.

In support of the argument that the court's approval of the Consent Order would constitute judicial rezoning, Artel and Smiling Hill bring two cases to the court's attention: *County of Volusia v. City of Deltona*, 925 So.2d 340 (Fla. Dist. Ct. App. 2006) and *Rogers Group, Inc. v. Masterson*, 175 S.W.3d 630 (Ky. Ct. App. 2005). *County of Volusia*, however, does not support their position. There, the City of Deltona, Florida, entered into an agreement to annex a tract of land owned by three individuals; the City later voted to annex the land and adopted the annexation ordinance. 925 So.2d at 342. On appeal, the court held that the zoning amendment approving the annexation was improper because the annexed lands were not sufficiently contiguous to the city's existing boundaries. *Id.* at 344. Although the appellate court questioned the validity of the agreement because of the substantial obligations it imposed on the city, the court remanded the case because the trial court had not considered the validity of the agreement. *Id.* at 345-46. Although Florida does not allow contract zoning,[7] the case does not stand for the proposition that enforcement of the agreement would constitute judicial rezoning. *Id.* *County of Volusia* is also distinguishable because the annexation agreement was not the settlement of litigation between the parties, it was the source of the dispute between the litigants.

The second case cited by Artel and Smiling Hill gives the court some pause. In *Rogers Group*, the landowner and a rock quarry company filed with the City of West Point, Kentucky, a conditional use permit to extract limestone from a 17-acre parcel. 175 S.W.3d at 632. At the time of the application, West Point did not have a "zoning classification that would have allowed

---

[7] A case cited in the decision, *Chung v. Sarasota County*, 686 So.2d 1358 (Fla. App. Ct. 1996), makes this point clear: "The City does not have the authority to enter into such a contract, which effectively contracts away the exercise of is police powers."

15

the operation of a rock quarry." *Id.* at 635. When the permitting process broke down, the applicants filed for a declaratory judgment that West Point's entire zoning system was unconstitutional under Kentucky precedent,[8] and West Point counterclaimed that it was in fact the owner of the 17-acre parcel by a deed reservation. *Id.* at 632-33. After a trial by deposition but before a decision in the case, the parties reached a settlement, and the court approved it as an agreed–upon judgment. *Id.* at 633. The agreed judgment allowed the applicants to operate a rock quarry on the parcel and further provided that the applicants' "ability to make use of the land [was] governed solely by the agreed judgment and not by ordinances" that had been or might be adopted by West Point. *Id.* at 634. The judgment was also binding upon successors and assigns. *Id.* A group of concerned citizens challenged the agreement as illegal judicial zoning. *Id.* at 633. And the appeals court agreed. *Id.* at 635. Despite some of the procedural similarities to the present case, the court does not find *Rogers Group* to be dispositive of the instant case.

First, *Rogers Group* is factually distinguishable from the present case. In *Rogers Group,* quarrying was not a pre-existing use of the property in question, the parcel had never been zoned for quarrying, and no zone in the city allowed quarrying. *Id.* at 632, 635. Further, the agreed judgment exempted the subject property from all present and future zoning ordinances; use of the land was governed *solely* by the consent judgment. *Id.* at 634. Finally, the terms of the agreement bore no relationship to the actual dispute being litigated: the constitutionality of the zoning system. *Id.* at 632-33. In contrast, quarrying and mining have been conducted on Pike's property for the past 40 years, and quarrying was once a permissible use in the zone. Further, the

---

[8] In *Hardin County v. Jost,* 897 S.W.2d 592 (Ky. Ct. App. 1995), Hardin County's zoning system was struck down as unconstitutional because it was essentially an ad hoc zoning system: there were only two permitted uses, and any other use required a conditional use permit.

proposed Consent Order does not purport to exempt Pike from all current and future ordinances and be the sole source of regulation of the parcel. Although the proposed Consent Order would trump conflicting provisions of Westbrook's ordinances, Pike's property would remain otherwise subject to all other Westbrook ordinances and state and federal law. Lastly, and importantly, the Consent Order bears a direct relationship to the issue being litigated: whether Pike has equitable rights to conduct mining and quarrying operations on its property.

In addition to these factual distinctions, the reasoning underlying the decision in *Rogers Group*, is not entirely clear to this court. The *Rogers Group* court explained:

> Kentucky case law makes clear that the judicial system is not to be substituted for decisions more appropriately made by a legislative body. Rezoning a piece of property is not a judicial function. Even where a court has the authority to find that an action by the legislative body is arbitrary, it does not have the authority to order a particular classification be applied to the property.

175 S.W.3d at 634 (citations omitted). The appellate court then went on to state that the trial court had engaged in judicial rezoning without explaining how or why. *Id.* As defined by the Kentucky court, judicial rezoning did not in fact occur in *Rogers Group*. The trial court did not make a determination of what zone should apply to the property in question or what uses should be allowed; the trial court simply approved the consent judgment as presented. *Id.* at 633. The real issue in *Rogers Group* is not that the agreement constituted judicial rezoning; the real issue is that the terms of the agreement were beyond all bounds of legality and the trial court should not have incorporated it into its judgment.

Pike, IDEXX, and Westbrook have presented the court with a proposed Consent Order that will dispose of the pending independent equitable claims. The agreement directly addresses the issue before the court: whether Pike may engage in quarrying and mineral extraction. The court is satisfied that the parties have consented to the agreement, and that the Consent Order is

17

lawful and does not dispose of any present or future rights of the non-consenting intervenors. No more is required.

Based on the foregoing, and pursuant to M.R. Civ. P. Rule 79(a), the Clerk is directed to enter this Order on the Civil Docket by a notation incorporating it by reference and the entry is

> The Consent Order presented to the court by Pike, IDEXX, and Westbrook is APPROVED. The parties are ordered to execute the agreement and present it to the court for incorporation as a judgment.

Dated: November 22, 2010                          s/Thomas E. Humphrey
                                                           Chief Justice, Superior Court

18