## LOCAL NUMBER 93, INTERNATIONAL ASSOCIA-TION OF FIREFIGHTERS, AFL–CIO, C. L. C. *v.* CITY OF CLEVELAND ET AL.

No. 84–1999.   Argued February 25, 1986—Decided July 2, 1986

502

BRENNAN, J., delivered the opinion of the Court, in which MARSHALL, BLACKMUN, POWELL, STEVENS, and O'CONNOR, JJ., joined. O'CONNOR, J., filed a concurring opinion, *post*, p. 530. WHITE, J., filed a dissenting opinion, *post*, p. 531. REHNQUIST, J., filed a dissenting opinion, in which BURGER, C. J., joined, *post*, p. 535.

*William L. Summers* argued the cause for petitioner. With him on the briefs was *Robert A. Dixon.*

*Assistant Attorney General Reynolds* argued the cause for the United States as *amicus curiae* in support of petitioner. With him on the brief were *Solicitor General Fried, Deputy Solicitor General Kuhl, Samuel A. Alito, Jr., Walter W. Barnett,* and *David K. Flynn.*

*Edward R. Stege, Jr.*, argued the cause and filed a brief for respondent Vanguards of Cleveland. *John D. Maddox* argued the cause and filed a brief for respondents city of Cleveland et al.*

---

*Briefs of *amici curiae* urging reversal were filed for the Anti-Defamation League of B'nai B'rith et al. by *Justin J. Finger, Jeffrey P. Sinensky, Abigail T. Kelman, Meyer Eisenberg, Allen L. Rothenberg,* and *Dennis Rapps;* for the International Association of Fire Fighters, AFL–CIO, C. L. C., by *Edward J. Hickey, Jr.,* and *Thomas A. Woodley;* for Local 542, International Union of Operating Engineers, et al. by *Robert M. Weinberg, Michael H. Gottesman, Jeremiah A. Collins, Edward D. Foy, Jr.,* and *George H. Cohen;* for the Pacific Legal Foundation by *Ronald A. Zumbrun* and *John H. Findley;* and for the Washington Legal Foundation by *Daniel J. Popeo* and *Paul D. Kamenar.*

Briefs of *amici curiae* urging affirmance were filed for the State of California et al. by *John K. Van de Kamp,* Attorney General of California, *Andrea Sheridan Ordin,* Chief Assistant Attorney General, *Marian M. Johnston,* Deputy Attorney General, *William J. Guste, Jr.,* Attorney General of Louisiana, *Frank J. Kelley,* Attorney General of Michigan, *Hubert H. Humphrey III,* Attorney General of Minnesota, *Robert M. Spire,* Attorney General of Nebraska, *W. Cary Edwards,* Attorney General of New Jersey, *Paul Bardacke,* Attorney General of New Mexico, *David Frohnmayer,* Attorney General of Oregon, *Charles G. Brown,* Attorney General of West Virginia, *Bronson C. La Follette,* Attorney General of Wisconsin, and *Elisabeth S. Shuster;* for the city of Atlanta et al. by *Anthony W. Robinson;* for the city of Birmingham, Alabama, by *James P. Alexander, Linda A. Friedman,* and *James K. Baker;* for the city of Detroit by *Daniel B. Edelman, John H. Suda, Charles L. Reischel, Frederick N. Merkin,* and *Robert Cramer;* for the Affirmative Action Coordinating Center et al. by *Frank E. Deale* and *Jules Lobel;* for the International Association of Black Professional Fire Fighters by *Lembhard G. Howell;* for the Lawyers' Committee for Civil Rights Under Law et al. by *Paul C. Saunders, Harold R. Tyler, James Robertson, Norman Redlich, William L. Robinson, Richard T. Seymour, Grover G. Hankins, Charles E. Carter, E. Richard Larson,* and *Burt Neuborne;* for the NAACP Legal Defense and Educational Fund, Inc., et al. by *Julius L. Chambers, Ronald L. Ellis, Clyde E. Murphy, Eric Schnapper, Grover G. Hankins, Antonia Hernandez,* and *Kenneth Kimerling;* for the National Conference of Black Mayors, Inc., by *Conrad K. Harper;* for the National Institute of Municipal Law Officers by *Roy D. Bates, William I. Thornton, Jr., John W. Witt, Roger F. Cutler,*

JUSTICE BRENNAN delivered the opinion of the Court.

The question presented in this case is whether § 706(g) of Title VII of the Civil Rights Act of 1964, 78 Stat. 261, as amended, 42 U. S. C. § 2000e–5(g), precludes the entry of a consent decree which provides relief that may benefit individuals who were not the actual victims of the defendant's discriminatory practices.

I

On October 23, 1980, the Vanguards of Cleveland (Vanguards), an organization of black and Hispanic firefighters employed by the City of Cleveland, filed a complaint charging the City and various municipal officials (hereinafter referred to collectively as the City) with discrimination on the basis of race and national origin "in the hiring, assignment and promotion of firefighters within the City of Cleveland Fire Department." App. 6. The Vanguards sued on behalf of a class of blacks and Hispanics consisting of firefighters already employed by the City, applicants for employment, and "all blacks and Hispanics who in the future will apply for employment or will be employed as firemen by the Cleveland Fire Department." Id., at 8.

The Vanguards claimed that the City had violated the rights of the plaintiff class under the Thirteenth and Fourteenth Amendments to the United States Constitution, Title VII of the Civil Rights Act of 1964, 42 U. S. C. § 2000e et seq., and 42 U. S. C. §§ 1981 and 1983. Although the complaint alleged facts to establish discrimination in hiring and work assignments, the primary allegations charged that

George Agnost, James D. Montgomery, Clifford D. Pierce, Jr., William H. Taube, Charles S. Rhyne, J. Lamar Shelley, Robert J. Alfton, James K. Baker, Frank B. Gummey III, and Barbara Mather; for the National League of Cities et al. by Benna Ruth Solomon and David A. Strauss; and for the NOW Legal Defense and Education Fund et al. by Marsha Levick and Emily J. Spitzer.

Robert E. Williams, Douglas S. McDowell, and Thomas R. Bagby filed a brief for the Equal Employment Advisory Council as amicus curiae.

black and Hispanic firefighters "have . . . been discriminated against by reason of their race and national origin in the awarding of promotions within the Fire Department." App. 11.[1] The complaint averred that this discrimination was effectuated by a number of intentional practices by the City. The written examination used for making promotions was alleged to be discriminatory. The effects of this test were said to be reinforced by the use of seniority points and by the manipulation of retirement dates so that minorities would not be near the top of promotion lists when positions became available. In addition, the City assertedly limited minority advancement by deliberately refusing to administer a new promotional examination after 1975, thus cancelling out the effects of increased minority hiring that had resulted from certain litigation commenced in 1973.

As just noted, the Vanguards' lawsuit was not the first in which the City had to defend itself against charges of race discrimination in hiring and promotion in its civil services. In 1972, an organization of black police officers filed an action alleging that the Police Department discriminated against minorities in hiring and promotions. See Shield Club v. City of Cleveland, 370 F. Supp. 251 (ND Ohio 1972). The District Court found for the plaintiffs and issued an order enjoining certain hiring and promotion practices and establishing mi-

---

[1] The Cleveland Fire Department has six ranks of officers. From the lowest to the highest rank, these are: Lieutenant, Captain, Battalion Chief, Assistant Chief, and Chief. To obtain a promotion, a firefighter must satisfy minimum experience requirements and pass a written examination. The examination is apparently quite difficult; approximately 80% of the applicants failed the 1984 promotional examination. Tr. of Oral Arg. 28. Firefighters who pass the written examination are assigned a place on a promotion eligibility list. Although rankings on the lists are based primarily on test scores, additional points are assigned on the basis of seniority. There is a separate list for each rank. These lists are to remain effective for one year, but may be extended for an additional year, and, as a practical matter, lists are ordinarily used for the full 2-year period. Promotions are made from the lists as positions become available.

nority hiring goals. In 1977, these hiring goals were adjusted and promotion goals were established pursuant to a consent decree. Thereafter, litigation raising similar claims was commenced against the Fire Department and resulted in a judicial finding of unlawful discrimination and the entry of a consent decree imposing hiring quotas similar to those ordered in the *Shield Club* litigation. See *Headen* v. *City of Cleveland*, No. C73–330 (ND Ohio, Apr. 25, 1975). In 1977, after additional litigation, the *Headen* court approved a new plan governing hiring procedures in the Fire Department.

By the time the Vanguards filed their complaint, then, the City had already unsuccessfully contested many of the basic factual issues in other lawsuits. Naturally, this influenced the City's view of the Vanguards' case. As expressed by counsel for the City at oral argument in this Court:

> "[W]hen this case was filed in 1980, the City of Cleveland had eight years at that point of litigating these types of cases, and eight years of having judges rule against the City of Cleveland.
>
> "You don't have to beat us on the head. We finally learned what we had to do and what we had to try to do to comply with the law, and it was the intent of the city to comply with the law fully . . . ." Tr. of Oral Arg. 41–42.

Thus, rather than commence another round of futile litigation, the City entered into "serious settlement negotiations" with the Vanguards. See Letter dated December 24, 1980, from Edward R. Stege, Jr., and Mark I. Wallach to Hon. Thomas J. Lambros.

On April 27, 1981, Local Number 93 of the International Association of Firefighters, AFL–CIO, C. L. C. (Local 93 or Union), which represents a majority of Cleveland's firefighters, moved pursuant to Federal Rule of Civil Procedure 24(a)(2) to intervene as a party-plaintiff. The District Court granted the motion and ordered the Union to submit its complaint in intervention within 30 days.

Local 93 subsequently submitted a three-page document entitled "Complaint of Applicant for Intervention." Despite its title, this document did not allege any causes of action or assert any claims against either the Vanguards or the City. It expressed the view that "[p]romotions based upon any criterion other than competence, such as a racial quota system, would deny those most capable from their promotions and would deny the residents of the City of Cleveland from maintaining the best possible fire fighting force," and asserted that "Local #93's interest is to maintain a well trained and properly staffed fire fighting force and [Local 93] contends that promotions should be made on the basis of demonstrated competency, properly measured by competitive examinations administered in accordance with the applicable provisions of Federal, State, and Local laws." App. 27, 28. The "complaint" concluded with a prayer for relief in the form of an injunction requiring the City to award promotions on the basis of such examinations. *Id.*, at 28.

In the meantime, negotiations between the Vanguards and the City continued, and a proposed consent decree was submitted to the District Court in November 1981. This proposal established "interim procedures" to be implemented "as a two-step temporary remedy" for past discrimination in promotions. *Id.*, at 33. The first step required that a fixed number of already planned promotions be reserved for minorities: specifically, 16 of 40 planned promotions to Lieutenant, 3 of 20 planned promotions to Captain, 2 of 10 planned promotions to Battalion Chief, and 1 of 3 planned promotions to Assistant Chief were to be made to minority firefighters. *Id.*, at 33–34. The second step involved the establishment of "appropriate minority promotion goal[s]," *id.*, at 34, for the ranks of Lieutenant, Captain, and Battalion Chief. The proposal also required the City to forgo using seniority points as a factor in making promotions. *Id.*, at 32–33. The plan was to remain in effect for nine years, and could be extended

upon mutual application of the parties for an additional 6-year period. *Id.*, at 36.

The District Court held a 2-day hearing at the beginning of January to consider the fairness of this proposed consent decree. Local 93 objected to the use of minority promotional goals and to the 9-year life of the decree. In addition, the Union protested the fact that it had not been included in the negotiations. This latter objection particularly troubled the District Judge. Indeed, although hearing evidence presented by the Vanguards and the City in support of the decree, the Judge stated that he was "appalled that these negotiations leading to this consent decree did not include the intervenors . . . ," and refused to pass on the decree under the circumstances. Tr. 134 (Jan. 7, 1982). Instead, he concluded: "I am going to at this time to defer this proceeding until another day and I am mandating the City and the [Vanguards] to engage the Fire Fighters in discussions, in dialogue. Let them know what is going on, hear their particular problems." *Id.*, at 151. At the same time, Judge Lambros explained that the Union would have to make its objections more specific to accomplish anything: "I don't think the Fire Fighters are going to be able to win their position on the basis that, 'Well, Judge, you know, there's something inherently wrong about quotas. You know, it's not fair.' We need more than that." *Id.*, at 153.

A second hearing was held on April 27. Local 93 continued to oppose any form of affirmative action. Witnesses for all parties testified concerning the proposed consent decree. The testimony revealed that, while the consent decree dealt only with the 40 promotions to Lieutenant already planned by the City, the Fire Department was actually authorized to make up to 66 offers; similarly, the City was in a position to hire 32 rather than 20 Captains and 14 rather than 10 Battalion Chiefs. After hearing this testimony, Judge Lambros proposed as an alternative to have the City make a high number of promotions over a relatively short period of time. The

Judge explained that if the City were to hire 66 Lieutenants rather than 40, it could "plug in a substantial number of black leadership that can start having some influence in the operation of this fire department" while still promoting the same nonminority officers who would have obtained promotions under the existing system. Tr. 147–148 (Apr. 27, 1982). Additional testimony revealed that this approach had led to the amicable resolution of similar litigation in Atlanta, Georgia. Judge Lambros persuaded the parties to consider revamping the consent decree along the lines of the Atlanta plan. The proceedings were therefore adjourned and the matter was referred to a United States Magistrate.

Counsel for all three parties participated in 40 hours of intensive negotiations under the Magistrate's supervision and agreed to a revised consent decree that incorporated a modified version of the Atlanta plan. See App. 79 (Report of Magistrate). However, submission of this proposal to the court was made contingent upon approval by the membership of Local 93. Despite the fact that the revised consent decree actually increased the number of supervisory positions available to nonminority firefighters, the Union members overwhelmingly rejected the proposal.[2]

---

[2] The vote was 660 to 89. This rejection was anticipated in the Magistrate's Report to the District Court:

"Acceptance by the general membership has always been recognized as a touch and go proposition. It was, however, believed that a favorable recommendation by Mr. Summers [counsel for the Union] and the Union's Executive Board would be given serious consideration by the general membership. Unfortunately, recent events having no bearing on this lawsuit, pertaining to the proposed closing of fire stations, have again strained relations between the firefighters and the City. Counsel fear that these feelings may rebound in a negative vote on this issue. It can only be hoped that the general membership will realize that voting down this proposal is not a way of getting back at the City and that rejection based upon such reasoning will simply delay the day when firefighters can stand together, without regard to race, and pursue their common interests and goals rather than wasting available resources, financial or otherwise, by engag-

On January 11, 1983, the Vanguards and the City lodged a second amended consent decree with the court and moved for its approval. This proposal was "patterned very closely upon the revised decree negotiated under the supervision of [the] Magistrate . . . ," App. to Pet. for Cert. A31, and thus its central feature was the creation of many more promotional opportunities for firefighters of all races. Specifically, the decree required that the City immediately make 66 promotions to Lieutenant, 32 promotions to Captain, 16 promotions to Battalion Chief, and 4 promotions to Assistant Chief. These promotions were to be based on a promotional examination that had been administered during the litigation. The 66 initial promotions to Lieutenant were to be evenly split between minority and nonminority firefighters. However, since only 10 minorities had qualified for the 52 upper-level positions, the proposed decree provided that all 10 should be promoted. The decree further required promotional examinations to be administered in June 1984 and December 1985. Promotions from the lists produced by these examinations were to be made in accordance with specified promotional "goals" that were expressed in terms of percentages and were different for each rank. The list from the 1985 examination would remain in effect for two years, after which time the decree would expire. The life of the decree was thus shortened from nine years to four. In addition, except where necessary to implement specific requirements of the consent decree, the use of seniority points was restored as a factor in ranking candidates for promotion. *Id.*, at A29–A38.

Local 93 was mentioned twice in the proposal. Paragraph 16 required the City to submit progress reports concerning compliance to both the Union and the Vanguards. *Id.*, at A36. In paragraph 24, the court reserved exclusive jurisdiction with respect to applications or claims made by "any

---

ing in intramural battles. Realistically, however, there is little room for optimism at this time." App. 78.

party, including Intervenor." *Id.*, at A38. The decree imposed no legal duties or obligations on Local 93.

On January 19, the City was ordered to notify the members of the plaintiff class of the terms of the proposed decree. In addition, persons who wished to object to the proposal were ordered to submit their objections in writing. Local 93 filed the following formal objection to the proposed consent decree:

> "Local #93 has consistently and steadfastly maintained that there must be a more equitable, more fair, more just way to correct the problems caused by the [City]. Many alternatives to the hopefully soon to be unnecessary 'remedial' methods embodied in the law have been explored and some have been utilized.
>
> "Local #93 reiterates it's *[sic]* absolute and total objection to the use of racial quotas which must by their very nature cause serious racial polarization in the Fire Service. Since this problem is obviously the concern of the collective representative of all members of the fire service, Intervenors, Local #93. *[sic]* We respectfully urge this court not to implement the 'remedial' provisions of this Decree." App. 98.

Apart from thus expressing its opinion as to the wisdom and necessity of the proposed consent decree, the Union still failed to assert any legal claims against either the Vanguards or the City.[3]

The District Court approved the consent decree on January 31, 1983. Judge Lambros found that "[t]he documents, statistics, and testimony presented at the January and April 1982 hearings reveal a historical pattern of racial discrimination in the promotions in the City of Cleveland Fire Depart-

---

[3] In addition to Local 93, three individual members of the Union voiced objections to the proposed consent decree in personal letters to the District Court. The basis of their objections was the same as the Union's. App. to Brief in Opposition of City of Cleveland A3 (memorandum opinion and order of District Court).

ment." App. to Brief in Opposition of City of Cleveland A3–A4. He then observed:

"While the concerns articulated by Local 93 may be valid, the use of a quota system for the relatively short period of four years is not unreasonable in light of the demonstrated history of racial discrimination in promotions in the City of Cleveland Fire Department. It is neither unreasonable nor unfair to require non-minority firefighters who, although they committed no wrong, benefited from the effects of the discrimination to bear some of the burden of the remedy. Furthermore, the amended proposal is more reasonable and less burdensome than the nine-year plan that had been proposed originally." *Id.*, at A5.

The Judge therefore overruled the Union's objection and adopted the consent decree "as a fair, reasonable, and adequate resolution of the claims raised in this action." *Ibid.* The District Court retained exclusive jurisdiction for "all purposes of enforcement, modification, or amendment of th[e] Decree upon the application of any party . . . ." App. to Pet. for Cert. A38.

The Union appealed the overruling of its objections. A panel for the Court of Appeals for the Sixth Circuit affirmed, one judge dissenting. *Vanguards of Cleveland* v. *City of Cleveland,* 753 F. 2d 479 (1985). The court rejected the Union's claim that the use of race-conscious relief was "unreasonable," finding such relief justified by the statistical evidence presented to the District Court and the City's express admission that it had engaged in discrimination. The court also found that the consent decree was "fair and reasonable to non-minority firefighters," emphasizing the "relatively modest goals set forth in the plan," the fact that "the plan does not require the hiring of unqualified minority firefighters or the discharge of any non-minority firefighters," the fact that the plan "does not create an absolute bar to the advancement

of non-minority employees," and the short duration of the plan. *Id.*, at 485.

After oral argument before the Court of Appeals, this Court decided *Firefighters* v. *Stotts*, 467 U. S. 561 (1984). "Concerned with the potential impact of *Stotts*," the Court of Appeals ordered the parties to submit supplemental briefs, 753 F. 2d, at 485–486, but ultimately concluded that *Stotts* did not affect the outcome of the case. The court noted that the District Court in *Stotts* had issued an injunction requiring layoffs over the objection of the City, while in this case the City of Cleveland had agreed to the plan. The court reasoned that even if *Stotts* holds that Title VII limits relief to those who have been actual victims of discrimination, "[t]he fact that this case involves a consent decree and not an injunction makes the legal basis of the *Stotts* decision inapplicable." 753 F. 2d, at 486.[4]

Local 93 petitioned this Court for a writ of certiorari. The sole issue raised by the petition is whether the consent decree is an impermissible remedy under § 706(g) of Title VII.[5]

---

[4] The Court of Appeals also distinguished *Stotts* on the ground that the injunction imposed by the District Court in that case "had the direct effect of abrogating a valid seniority system to the detriment of non-minority workers," while "[i]n this case, the consent decree assured the integrity of the existing seniority system." 753 F. 2d, at 486.

[5] The petition for certiorari sets forth two questions:

"1. May a District Court adopt provisions in a consent decree purporting to remedy a Title VII violation that it would have had no authority to order as a remedy if the matter had gone to trial?

"2. May a municipal employer voluntarily adopt an affirmative action promotional scheme over the objections of an intervenor union duly elected to represent all employees when said promotional scheme adversely affects the rights and interests of the employees and awards relief to minority employees regardless of whether they were actual victims of past racial discrimination?"

The first of these questions plainly asks only whether Title VII precludes the entry of this consent decree. Although the second question can conceivably be read to embody a more general challenge respecting the effect of the consent decree on petitioner's legal rights, neither the petition for

Local 93 argues that the consent decree disregards the express prohibition of the last sentence of § 706(g) that

> "*[n]o order of the court shall require* the admission or reinstatement of an individual as a member of a union, or *the hiring, reinstatement, or promotion of an individual as an employee,* or the payment to him of any back pay, *if such individual* was refused admission, suspended, or expelled, *or was refused employment or advancement* or was suspended or discharged *for any reason other than discrimination on account of race,* color, religion, sex, or national origin or in violation of section 2000e–3(a) of this title." 42 U. S. C. § 2000e–5(g) (emphasis added).

According to Local 93, this sentence precludes a court from awarding relief under Title VII that may benefit individuals who were not the actual victims of the employer's discrimination. The Union argues further that the plain language of the provision that "[n]o order of the court" shall provide such relief extends this limitation to orders entered by consent in addition to orders issued after litigation. Consequently, the Union concludes that a consent decree entered in Title VII litigation is invalid if—like the consent decree approved in this case—it utilizes racial preferences that may benefit individuals who are not themselves actual victims of an employer's discrimination. The Union is supported by the United States as *amicus curiae.*[6]

---

certiorari nor the brief on the merits discusses any issue other than whether this consent decree was prohibited by § 706(g) of Title VII. Moreover, petitioner limited its challenge below to whether the consent decree was "reasonable," and then, after *Stotts* was decided, to whether the consent decree was permissible under § 706(g). Finally, the District Court's retention of jurisdiction leaves it open for petitioner to press whatever other claims it might have before that court, see *infra,* at 530. Therefore, we deem it necessary to decide only the question whether § 706(g) precluded the District Court from entering this consent decree.

[6] The United States took exactly the opposite position in *Steelworkers* v. *Weber,* 443 U. S. 193 (1979). See Brief for United States and EEOC, O. T. 1978, Nos. 78–432, 78–435, and 78–436, pp. 26–38.

We granted the petition in order to answer this important question of federal law. 474 U. S. 816 (1985). The Court holds today in *Sheet Metal Workers* v. *EEOC, ante,* p. 421, that courts may, in appropriate cases, provide relief under Title VII that benefits individuals who were not the actual victims of a defendant's discriminatory practices. We need not decide whether this is one of those cases, however. For we hold that whether or not § 706(g) precludes a court from imposing certain forms of race-conscious relief after trial, that provision does not apply to relief awarded in a consent decree.[7] We therefore affirm the judgment of the Court of Appeals.

## II

We have on numerous occasions recognized that Congress intended voluntary compliance to be the preferred means of achieving the objectives of Title VII. *Alexander* v. *Gardner-Denver Co.,* 415 U. S. 36, 44 (1974); *Albemarle Paper Co.* v. *Moody,* 422 U. S. 405, 417–418 (1975) (quoting *United States* v. *N. L. Industries, Inc.,* 479 F. 2d 354, 379 (CA8 1973)) (Title VII sanctions intended to cause employers " 'to self-examine and self-evaluate their employment practices and to endeavor to eliminate, so far as possible, the last vestiges of an unfortunate and ignominious page in this country's history' "). See also *Teamsters* v. *United States,* 431 U. S. 324, 364 (1977); *Ford Motor Co.* v. *EEOC,* 458 U. S. 219, 228 (1982); *W. R. Grace & Co.* v. *Rubber Workers,* 461 U. S. 757, 770–771 (1983). This view is shared by the Equal Employment Opportunity Commission (EEOC), which has promulgated guidelines setting forth its understanding that "Congress strongly encouraged employers . . . to act on a voluntary basis to modify employment practices and systems

---

[7] We emphasize that, in light of this holding, nothing we say here is intended to express a view as to the extent of a court's remedial power under § 706(g) in cases where that provision does apply. That question is addressed in *Sheet Metal Workers* v. *EEOC, ante,* at 444–479.

which constituted barriers to equal employment opportunity . . . ." 29 CFR § 1608.1(b) (1985). According to the EEOC:

"The principle of nondiscrimination in employment because of race, color, religion, sex, or national origin, and the principle that each person subject to Title VII should take voluntary action to correct the effects of past discrimination and to prevent present and future discrimination without awaiting litigation, are mutually consistent and interdependent methods of addressing social and economic conditions which precipitated the enactment of Title VII. Voluntary affirmative action to improve opportunities for minorities and women must be encouraged and protected in order to carry out the Congressional intent embodied in Title VII." § 1608.1(c) (footnote omitted).

It is equally clear that the voluntary action available to employers and unions seeking to eradicate race discrimination may include reasonable race-conscious relief that benefits individuals who were not actual victims of discrimination. This was the holding of *Steelworkers* v. *Weber*, 443 U. S. 193 (1979). In *Weber*, an employer and a union agreed in collective bargaining to reserve for black employees 50% of the openings in an in-plant, craft-training program until the percentage of black craftworkers in the plant was commensurate with the percentage of blacks in the local labor force. After considering both the purposes of Title VII and its legislative history, we concluded that "[i]t would be ironic indeed if a law triggered by a Nation's concern over centuries of racial injustice and intended to improve the lot of those who had 'been excluded from the American dream for so long' constituted the first legislative prohibition of all voluntary, private, race-conscious efforts to abolish traditional patterns of racial segregation and hierarchy." *Id.*, at 204 (citation omitted). Accordingly, we held that Title VII permits employers and unions voluntarily to make use of reasonable race-conscious affirmative action, although we left to another day the task of

"defin[ing] in detail the line of demarcation between permissible and impermissible affirmative action plans." *Id.*, at 208.

Of course, *Weber* involved a purely private contractual agreement rather than a consent decree. But, at least at first blush, there does not seem to be any reason to distinguish between voluntary action taken in a consent decree and voluntary action taken entirely outside the context of litigation.[8] Indeed, in *Carson* v. *American Brands, Inc.*, 450 U. S. 79, 88, n. 14 (1981), we held that a District Court's order denying entry of a consent decree is appealable under 28 U. S. C. § 1292(a)(1) because such an order undermines Congress' "strong preference for encouraging voluntary settlement of employment discrimination claims" under Title VII. Moreover, the EEOC's guidelines concerning "Affirmative Action Appropriate Under Title VII of the Civil Rights Act of 1964," 29 CFR pt. 1608 (1985), plainly contemplate the

---

[8] Unlike *Weber*, which involved a private employer, this case involves a public employer whose voluntary actions are subject to the strictures of the Fourteenth Amendment as well as to the limitations of § 703 of Title VII. In the posture in which this case comes to us, we have no occasion to address the circumstances, if any, in which voluntary action by a public employer that is permissible under § 703 would nonetheless be barred by the Fourteenth Amendment. Rather, as is explained *infra*, at 530, we leave questions regarding the application of the Fourteenth Amendment to the underlying agreement to further proceedings before the District Court. Nor need we decide what limits § 703 places on an employer's ability to agree to race-conscious relief in a voluntary settlement that is not embodied in a consent decree, or what showing the employer would be required to make concerning possible prior discrimination on its part against minorities in order to defeat a challenge by nonminority employees based on § 703. Cf. *Wygant* v. *Jackson Board of Education*, 476 U. S. 267 (1986). In any event, there may be instances in which a public employer, consistent with both the Fourteenth Amendment as interpreted in *Wygant* and § 703 as interpreted in *Weber*, could voluntarily agree to take race-conscious measures in pursuance of a legitimate remedial purpose. The only issue before us is whether, assuming, *arguendo*, that § 706(g) would bar a court from ordering such race-conscious relief after trial in some of these instances, § 706(g) also bars a court from approving a consent decree entered into by the employer and providing for such relief.

use of consent decrees as an appropriate form of voluntary affirmative action. See, *e. g.*, § 1608.8.[9] True, these guidelines do not have the force of law, *General Electric Co.* v. *Gilbert*, 429 U. S. 125, 141 (1976), but still they "'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'" *Id.*, at 142 (quoting *Skidmore* v. *Swift & Co.*, 323 U. S. 134, 140 (1944)). Therefore, absent some contrary indication, there is no reason to think that voluntary, race-conscious affirmative action such as was held permissible in *Weber* is rendered impermissible by Title VII simply because it is incorporated into a consent decree.

Local 93 and the United States find a contrary indicator in § 706(g), which governs the courts' remedial power under Title VII. They contend that § 706(g) establishes an independent limitation on what *courts*—as opposed to employers or unions—can do, prohibiting any "order of the court" from providing relief that may benefit nonvictims. They argue that a consent decree should be treated as an "order" within the meaning of § 706(g) because it possesses the legal force and character of a judgment decreed after a trial. They rely for this conclusion on several characteristics of consent decrees: first, that a consent decree looks like and is entered as a judgment; second, that the court retains the power to modify a consent decree in certain circumstances over the objection of a signatory, see *United States* v. *Swift & Co.*, 286 U. S. 106, 114 (1932) *(Swift II);* third, that noncompliance with a consent decree is enforceable by citation for contempt of court, see *United States* v. *City of Miami*, 664 F. 2d 435, 440, and n. 8 (CA5 1981) (opinion of Rubin, J.).

---

[9] The EEOC has not joined the brief for the United States in this case. The United States' brief has been filed only on behalf of the Attorney General, who has some limited enforcement responsibility under Title VII, see 42 U. S. C. § 2000e–5(f)(1), and the Federal Government in its capacity as an employer, § 2000e–16.

To be sure, consent decrees bear some of the earmarks of judgments entered after litigation. At the same time, because their terms are arrived at through mutual agreement of the parties, consent decrees also closely resemble contracts. See *United States* v. *ITT Continental Baking Co.*, 420 U. S. 223, 235–237 (1975); *United States* v. *Armour & Co.*, 402 U. S. 673 (1971). More accurately, then, as we have previously recognized, consent decrees "have attributes both of contracts and of judicial decrees," a dual character that has resulted in different treatment for different purposes. *United States* v. *ITT Continental Baking Co., supra*, at 235–237, and n. 10. The question is not whether we can label a consent decree as a "contract" or a "judgment," for we can do both. The question is whether, given their hybrid nature, consent decrees implicate the concerns embodied in § 706(g) in such a way as to require treating them as "orders" within the meaning of that provision.

Because this Court's cases do not treat consent decrees as judicial decrees in all respects and for all purposes, we think that the language of § 706(g) does not so clearly include consent decrees as to preclude resort to the voluminous legislative history of Title VII. The issue is whether, when Congress used the phrase "[n]o order of the court shall require" in § 706(g), it unmistakably intended to refer to *consent* decrees. In addition to the fact that consent decrees have contractual as well as judicial features, the use of the verb "require" in § 706(g) suggests that it was the coercive aspect of a judicial decree that Congress had in mind. We turn therefore to the legislative history, since the language of § 706(g) does not clearly settle the matter.

The conclusion in *Weber* that "Congress chose not to forbid all voluntary race-conscious affirmative action" when it enacted Title VII was largely based upon the legislative history, which shows that Congress was particularly concerned to avoid undue federal interference with managerial discretion. *Weber*, 443 U. S., at 205–207. As originally enacted,

Title VII regulated only private enterprises; the liberal Republicans and Southern Democrats whose support was crucial to obtaining passage of the bill expressed misgivings about the potential for Government intrusion into the managerial decisions of employers and unions beyond what was necessary to eradicate unlawful discrimination. *Id.*, at 206. Their votes were obtained only after they were given assurances that "management prerogatives, and union freedoms are to be left undisturbed to the greatest extent possible." H. R. Rep. No. 914, 88th Cong., 1st Sess., pt. 2, p. 29 (1963). See also, 110 Cong. Rec. 1518 (1964) (remarks of Rep. Celler); *id.*, at 11471 (remarks of Sen. Javits); *id.*, at 14314 (remarks of Sen. Miller); *id.*, at 15893 (remarks of Rep. McCulloch). As one commentator points out, rather than seeking to outlaw voluntary affirmative action, the more conservative proponents of Title VII who held the balance of power in 1964 "were far more concerned to avoid the intrusion into business autonomy that a rigid color-blind standard would entail." Note, Preferential Relief Under Title VII, 65 Va. L. Rev. 729, 771, n. 224 (1979). See also, *Weber, supra*, at 207–208, n. 7 (quoting 110 Cong. Rec. 15893 (1964) (remarks of Rep. MacGregor)) (Congress was not legislating about " 'preferential treatment or quotas in employment' " because it believed that " 'the problems raised by these controversial questions are more properly handled at a governmental level closer to the American people and by communities and individuals themselves' ").

The legislative history pertaining specifically to § 706(g) suggests that it was drafted with this concern in mind and, in fact, that a principal purpose of the last sentence of § 706(g) was to protect managerial prerogatives of employers and unions.[10] See H. R. Rep. No. 914, 88th Cong., 1st Sess., pt. 1,

---

[10] Title VII was expanded to cover municipalities by the Equal Employment Opportunity Act of 1972, Pub. L. 92–261, 86 Stat. 103. Although the legislative history of the 1972 amendments does not reflect the same concern with preserving the managerial discretion of governmental employers

p. 11 (1963) (first version of § 706(g) preserving employer defense of "cause"); 110 Cong. Rec. 2567–2571 (1964) (amending this version to substitute for "any reason other than discrimination" in place of "cause"); *id.*, at 2567 (remarks of Rep. Celler, the amendment's sponsor, that the amendment's purpose was "to specify cause"); *id.*, at 6549 (remarks of Sen. Humphrey that § 706(g) makes clear "that employers may hire and fire, promote and refuse to promote for any reason, good or bad" except when such decisions violate the substantive provisions of Title VII). Thus, whatever the extent of the limits § 706(g) places on the power of the federal courts to compel employers and unions to take certain actions that the employers or unions oppose and would not otherwise take, § 706(g) by itself does not restrict the ability of employers or unions to enter into voluntary agreements providing for race-conscious remedial action. The limits on such agreements must be found outside § 706(g).[11]

From this, it is readily apparent that consent decrees are not included among the "orders" referred to in § 706(g), for the voluntary nature of a consent decree is its most funda-

---

that was evident in 1964 with respect to the private sector, there is also no indication that Congress intended to leave governmental employers with less latitude under Title VII than had been left to employers in the private sector when Title VII was originally enacted. See generally Subcommittee on Labor of the Senate Committee on Labor and Public Welfare, Legislative History of the Equal Employment Opportunity Act of 1972, 92d Cong., 2d Sess. (Comm. Print 1972).

[11] Thus, we do not suggest that voluntary action by employers or unions is outside the ambit of Title VII regardless of its effect on nonminorities. We already rejected such arguments in *McDonald* v. *Santa Fe Trail Transp. Co.*, 427 U. S. 273 (1976), and *Steelworkers* v. *Weber*, 443 U. S. 193 (1979). Section 706(g), by its own terms, limits courts, not employers or unions, and focuses on preserving certain management prerogatives from interference by the federal courts. The rights of nonminorities with respect to action by their employers are delineated in § 703 of Title VII, 42 U. S. C. § 2000e–2, and, in cases involving governmental employees, by the Fourteenth Amendment. See *Weber, supra; Wygant* v. *Jackson Board of Education*, 476 U. S. 267 (1986).

mental characteristic. See *United States* v. *ITT Continental Baking Co.*, 420 U. S., at 235–237; *United States* v. *Armour & Co.*, 402 U. S. 673 (1971); *Hughes* v. *United States*, 342 U. S. 353 (1952); *United States* v. *Atlantic Refining Co.*, 360 U. S. 19 (1959); *Ashley* v. *City of Jackson*, 464 U. S. 900, 902 (1983) (REHNQUIST, J., dissenting from denial of certiorari). As we observed in *United States* v. *Armour & Co.*:

> "Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation. Thus, the *decree* itself cannot be said to have a purpose; rather the *parties* have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve." 402 U. S., at 681–682 (emphasis in original) (footnote omitted).

Indeed, it is the parties' agreement that serves as the source of the court's authority to enter any judgment at all. See *United States* v. *Ward Baking Co.*, 376 U. S. 327 (1964) (cannot enter consent decree to which one party has not consented); *Ashley* v. *City of Jackson, supra*, at 902 (REHNQUIST, J., dissenting from denial of certiorari). More importantly, it is the agreement of the parties, rather than the force of the law upon which the complaint was originally based, that creates the obligations embodied in a consent decree. Consequently, whatever the limitations Congress placed in § 706(g) on the power of federal courts to impose obligations on employers or unions to remedy violations of

Title VII, these simply do not apply when the obligations are created by a consent decree.

The features of consent decrees designated by the Union and the United States do not require a contrary result. The fact that a consent decree *looks* like a judgment entered after a trial obviously does not implicate Congress' concern with limiting the power of federal courts unilaterally to require employers or unions to make certain kinds of employment decisions. The same is true of the court's conditional power to modify a consent decree; the mere *existence* of an *unexercised* power to modify the obligations contained in a consent decree does not alter the fact that those obligations were created by agreement of the parties rather than imposed by the court.[12] Finally, we reject the argument that a consent decree should be treated as an "order" within the meaning of § 706(g) because it can be enforced by a citation for contempt. There is no indication in the legislative history that the availability of judicial enforcement of an obligation, rather than the creation of the obligation itself, was the focus of congressional concern. In fact, judicial enforcement is available whether race-conscious relief is provided in a collective-bargaining agreement (as in *Weber*) or in a consent decree; only the form of that enforcement is different. But the difference between contractual remedies and the contempt power is not significant in any relevant sense with respect to § 706(g). For the choice of an enforcement scheme—whether to rely on contractual remedies or to have an agreement entered as a consent decree—is itself made voluntarily by the parties.[13] Thus, it does not implicate

---

[12] However, as is discussed below, the court's *exercise* of the power to modify the decree over the objection of a party to the decree does implicate § 706(g). *Infra,* at 527–528.

[13] Parties may choose to settle their disputes by consent decree rather than by private contract for a number of reasons. As one commentator points out, "[p]ublic law settlements are often complicated documents designed to be carried out over a period of years, . . . so any purely out-of-court settlement would suffer the decisive handicap of not being subject to

Congress' concern that federal courts not impose unwanted obligations on employers and unions any more than the decision to institute race-conscious affirmative action in the first place; in both cases the parties have themselves created obligations and surrendered claims in order to achieve a mutually satisfactory compromise.

## III

Relying upon *Firefighters* v. *Stotts*, 467 U. S. 561 (1984), and *Railway Employees* v. *Wright*, 364 U. S. 642 (1961), Local 93—again joined by the United States—contends that we have recognized as a general principle that a consent decree cannot provide greater relief than a court could have decreed after a trial. They urge that even if § 706(g) does not directly invalidate the consent decree, that decree is nonetheless void because the District Court "would have been powerless to order [such an injunction] under Title VII, had the matter actually gone to trial." Brief for Petitioner 17.

---

continuing oversight and interpretation by the court." Schwarzschild, Public Law by Private Bargain: Title VII Consent Decrees and the Fairness of Negotiated Institutional Reform, 1984 Duke L. J. 887, 899. In addition to this advantage, the National League of Cities and its joining *amici* add:

"A consent decree has several other advantages as a means of settling litigation. It is easier to obtain enforcement of a consent decree because it will be unnecessary to prove many facts that would otherwise have to be shown in order to establish the validity of an ordinary contract. A court that maintains continuing jurisdiction over a consent decree will have a more flexible repertoire of enforcement measures. And it is likely to be easier to channel litigation concerning the validity and implications of a consent decree into a single forum—the court that entered the decree—thus avoiding the waste of resources and the risk of inconsistent or conflicting obligations." Brief for National League of Cities *et al.* as *Amici Curiae* 25.

For all of these reasons, consent decrees have become widely used as devices to facilitate settlement. Indeed, we have little doubt that the interpretation of § 706(g) proposed by the Union and the United States would make it substantially more difficult to settle Title VII litigation, contrary to the expressed congressional preference for voluntary remedial action.

We concluded above that voluntary adoption in a consent decree of race-conscious relief that may benefit nonvictims does not violate the congressional objectives of § 706(g). It is therefore hard to understand the basis for an independent judicial canon or "common law" of consent decrees that would give § 706(g) the effect of prohibiting such decrees anyway. To be sure, a federal court is more than "a recorder of contracts" from whom parties can purchase injunctions; it is "an organ of government constituted to make judicial decisions . . . ." 1B J. Moore, J. Lucas, & T. Currier, Moore's Federal Practice ¶ 0.409[5], p. 331 (1984) (hereinafter Moore). Accordingly, a consent decree must spring from and serve to resolve a dispute within the court's subject-matter jurisdiction. Furthermore, consistent with this requirement, the consent decree must "com[e] within the general scope of the case made by the pleadings," *Pacific R. Co.* v. *Ketchum,* 101 U. S. 289, 297 (1880), and must further the objectives of the law upon which the complaint was based, *EEOC* v. *Safeway Stores, Inc.,* 611 F. 2d 795, 799 (CA10 1979), cert. denied *sub nom. Courtwright* v. *EEOC,* 446 U. S. 952 (1980); *Citizens for a Better Environment* v. *Gorsuch,* 231 U. S. App. D. C. 79, 87, 90, 718 F. 2d 1117, 1125, 1128 (1983), cert. denied *sub nom. Union Carbide Corp.* v. *Natural Resources Defense Council, Inc.,* 467 U. S. 1219 (1984). However, in addition to the law which forms the basis of the claim, the parties' consent animates the legal force of a consent decree. See *Pacific R. Co.* v. *Ketchum, supra; Citizens for a Better Environment* v. *Gorsuch, supra,* at 89–90, 718 F. 2d, at 1127–1128; Note, The Consent Judgment as an Instrument of Compromise and Settlement, 72 Harv. L. Rev. 1314, 1317 (1959). Therefore, a federal court is not necessarily barred from entering a consent decree merely because the decree provides broader relief than the court could have awarded after a trial. See, *e. g., Pacific R. Co.* v. *Ketchum, supra,* at 295–297; *Swift* & *Co.* v. *United States,* 276 U. S. 311, 327–331 (1928) *(Swift I)* (Brandeis, J.); *EEOC* v. *Safeway*

*Stores, Inc., supra,* at 799–800; *Citizens for a Better Environment* v. *Gorsuch, supra,* at 89–91, 718 F. 2d, at 1127–1130; *Sansom Committee* v. *Lynn,* 735 F. 2d 1535, 1538–1539 (CA3), cert. denied, 469 U. S. 1017 (1984); *Turner* v. *Orr,* 759 F. 2d 817, 825–826 (CA8 1985).

This is not to say that the parties may agree to take action that conflicts with or violates the statute upon which the complaint was based. As noted above, the fact that the parties have consented to the relief contained in a decree does not render their action immune from attack on the ground that it violates § 703 of Title VII or the Fourteenth Amendment. However, inasmuch as the limits placed by § 706(g) on the remedial authority of a federal court—whatever these may be—are not implicated by voluntary agreements, there is no conflict with or violation of § 706(g) when a federal court enters a consent decree that provides such relief. Accordingly, to the extent that the consent decree is not otherwise shown to be unlawful, the court is not barred from entering a consent decree merely because it might lack authority under § 706(g) to do so after a trial.

This simply was not the case in either *Railway Employees* v. *Wright* or *Firefighters* v. *Stotts,* in both of which the Court found conflicts between a judicial decree and the underlying statute. In *Wright,* a railroad and the unions representing most of its employees were charged with discriminating against nonunion employees in violation of the Railway Labor Act, 45 U. S. C. § 151 *et seq.* The parties entered a consent decree that prohibited, among other things, the establishment of a union shop, a restriction that was also contained in the Railway Labor Act at the time. When the Act was amended several years later to permit union shops, the unions moved to modify the consent decree; their motion was opposed by the plaintiffs and by the railroad. This Court reversed the District Court's denial of this motion, holding that refusal to modify the consent decree constituted an abuse of discretion under the circumstances. The Court recognized

that the District Court retained power to modify the consent decree and that "a sound judicial discretion" may call for such modification "if the circumstances, whether of law or fact, obtaining at the time of its issuance have changed, or new ones have arisen." 364 U. S., at 646–647. Because it viewed the intervening amendment of the Railway Labor Act as rendering the consent decree incompatible with the terms of the Act, the Court regarded as "established" the conclusion that, had the decree represented relief awarded after trial, it would have been an abuse of discretion to deny modification. *Id.*, at 648–650. This left only the question whether "th[e] result [is] affected by the fact that we are dealing with a consent decree." *Id.*, at 648–650. Citing *Swift II* for the proposition that the power to modify a consent decree is the same as the power to modify a litigated decree, the Court held that a District Court "must . . . be free to modify the terms of the consent decree when a change in law brings those terms in conflict with statutory objectives." 364 U. S., at 650–651.

*Firefighters* v. *Stotts*, 467 U. S. 561 (1984), also involved a consent decree that the Court concluded was in conflict with the underlying statute, in that case Title VII. The plaintiffs and the city of Memphis entered into a consent decree that included the use of racial preferences for hiring and promoting firefighters. After the decree had been in effect for just over a year, budget deficits forced Memphis to lay off a number of firefighters. Because layoffs pursuant to Memphis' "last hired, first fired" rule would undo the gains made by minority firefighters under the decree, the plaintiffs sought and obtained an injunction requiring Memphis to modify its seniority rules to protect new black employees. We reversed. We held first that the injunction could not be upheld as merely enforcing the terms of the consent decree. *Id.*, at 572–576. The plaintiffs argued in the alternative that the injunction was justified by the change in circumstances brought about by the budget deficits and that it thus constituted a proper modification of the decree. We rejected this argu-

ment, reasoning that "the District Court's authority to impose a modification of a decree is not wholly dependent on the decree," but must also be consistent with the underlying statute. *Id.*, at 576, n. 9. Noting that the Court in *Wright* "held that when a change in the law brought the terms of the decree into conflict with the statute pursuant to which the decree was entered, the decree should be modified over the objections of one of the parties bound by the decree," we reasoned: "By the same token, and for the same reason, a district court cannot enter a disputed modification of a consent decree in Title VII litigation if the resulting order is inconsistent with that statute." 467 U. S., at 576, n. 9. Because we concluded that the District Court would have been precluded by Title VII from issuing an injunction such as the one it had issued after a trial, *id.*, at 577–583, we rejected the plaintiffs' argument and held that "the District Court was precluded from granting such relief over the City's objection" by modifying the consent decree, *id.*, at 576–577, n. 9.

Because § 706(g) is not concerned with voluntary agreements by employers or unions to provide race-conscious relief, there is no inconsistency between it and a consent decree providing such relief, although the court might be barred from ordering the same relief after a trial or, as in *Stotts*, in disputed proceedings to modify a decree entered upon consent.

## IV

Local 93 and the United States also challenge the validity of the consent decree on the ground that it was entered without the consent of the Union. They take the position that because the Union was permitted to intervene as of right, its consent was required before the court could approve a consent decree. This argument misconceives the Union's rights in the litigation.

A consent decree is primarily a means by which parties settle their disputes without having to bear the financial and other costs of litigating. It has never been supposed that

one party—whether an original party, a party that was joined later, or an intervenor—could preclude other parties from settling their own disputes and thereby withdrawing from litigation. Thus, while an intervenor is entitled to present evidence and have its objections heard at the hearings on whether to approve a consent decree, it does not have power to block the decree merely by withholding its consent. See *Zipes* v. *Trans World Airlines, Inc.*, 455 U. S. 385, 392, 400 (1982); *Kirkland* v. *New York State Dept. of Correctional Services*, 711 F. 2d 1117, 1126 (CA2 1983), cert. denied, 465 U. S. 1005 (1984). Here, Local 93 took full advantage of its opportunity to participate in the District Court's hearings on the consent decree. It was permitted to air its objections to the reasonableness of the decree and to introduce relevant evidence; the District Court carefully considered these objections and explained why it was rejecting them. Accordingly, "the District Court gave the union all the process that [it] was due . . . ." *Zipes, supra,* at 400.

Of course, parties who choose to resolve litigation through settlement may not dispose of the claims of a third party, and *a fortiori* may not impose duties or obligations on a third party, without that party's agreement. A court's approval of a consent decree between some of the parties therefore cannot dispose of the valid claims of nonconsenting intervenors; if properly raised, these claims remain and may be litigated by the intervenor. 3B Moore ¶ 24.16[6], p. 181; see also, *United States Steel Corp.* v. *EPA*, 614 F. 2d 843, 845–846 (CA3 1979); *Wheeler* v. *American Home Products Corp.*, 563 F. 2d 1233, 1237–1238 (CA5 1977). And, of course, a court may not enter a consent decree that imposes obligations on a party that did not consent to the decree. See, *e. g., United States* v. *Ward Baking Co.*, 376 U. S. 327 (1964); *Hughes* v. *United States*, 342 U. S. 353 (1952); *Ashley* v. *City of Jackson*, 464 U. S., at 902 (REHNQUIST, J., dissenting from denial of certiorari); 1B Moore ¶ 0.409[5], p. 326, n. 2. However, the consent decree entered here does not

bind Local 93 to do or not to do anything. It imposes no legal duties or obligations on the Union at all; only the parties to the decree can be held in contempt of court for failure to comply with its terms. See *United States* v. *Armour & Co.*, 402 U. S., at 676–677. Moreover, the consent decree does not purport to resolve any claims the Union might have under the Fourteenth Amendment, see *Wygant* v. *Jackson Board of Education*, 476 U. S. 267 (1986), under § 703 of Title VII, see *McDonald* v. *Santa Fe Trail Transp. Co.*, 427 U. S. 273 (1976); *Steelworkers* v. *Weber*, 443 U. S. 193 (1979), or as a matter of contract, see *W. R. Grace & Co.* v. *Rubber Workers*, 461 U. S. 757 (1983). Indeed, despite the efforts of the District Judge to persuade it to do so, the Union failed to raise any substantive claims. Whether it is now too late to raise such claims, or—if not—whether the Union's claims have merit are questions that must be presented in the first instance to the District Court, which has retained jurisdiction to hear such challenges. The only issue before us is whether § 706(g) barred the District Court from approving this consent decree. We hold that it did not. Therefore, the judgment of the Court of Appeals is

*Affirmed.*

JUSTICE O'CONNOR, concurring.

I join the Court's opinion. I write separately to emphasize that the Court's holding is a narrow one. The Court holds that the relief provided in a consent decree need not conform to the limits on court-ordered relief imposed by § 706(g), whatever those limits may be. Rather, the validity of race-conscious relief provided in a consent decree is to be assessed for consistency with the provisions of § 703, such as § 703(a) and § 703(d), which were at issue in *Steelworkers* v. *Weber*, 443 U. S. 193 (1979), and, in the case of a public employer, for consistency with the Fourteenth Amendment. As the Court explains, nonminority employees therefore remain free to challenge the race-conscious measures contemplated by a proposed consent decree as violative of their rights under

§ 703 or the Fourteenth Amendment. Even if nonminority employees do not object to the consent decree, a court should not approve a consent decree that on its face provides for racially preferential treatment that would clearly violate § 703 or the Fourteenth Amendment. Finally, the Court refrains from deciding "what showing [an] employer would be required to make concerning prior discrimination on its part against minorities in order to defeat a challenge by nonminority employees based on § 703." *Ante,* at 517, n. 8.

It is clear, then, that the Court's opinion does not hold or otherwise suggest that there is no "necessary predicate for race-conscious practices . . . favoring one race over another," *post,* at 532 (WHITE, J., dissenting), when those practices are embodied in a voluntary settlement or in a consent decree rather than ordered by the court over the objection of an employer or union. If *Weber* indicates that an employer's or union's "prior discriminatory conduct" is the necessary "predicate for a temporary remedy favoring black employees," *post,* at 532, the Court's opinion leaves that requirement wholly undisturbed. The Court leaves open the question whether the race-conscious measures provided for in the consent decree at issue here were permissible under § 703. I agree with the Court that it is not necessary to decide that question in the present posture of this case, and that any challenge petitioner may make to the consent decree on substantive grounds, whether based on § 703 or the Fourteenth Amendment, should be left for resolution on remand.

JUSTICE WHITE, dissenting.

For several reasons, I am unable to join either the Court's opinion or judgment.

Title VII forbids racially discriminatory employment practices. The general proscription of § 703 is that an employer may not discriminate against either blacks or whites in either hiring or promotion. An employer may not, without violating Title VII, simply decide for itself or in agreement with its employees to have a racially balanced work force and displace

employees of any race to make room for employees of another race. Even without displacing any present employees, Title VII would forbid quota hiring or promotion such as reserving every third vacancy or promotion for a black, or for a white for that matter. And if this is the case, it must be wholly untenable to permit a court to enter a consent decree requiring conduct that would violate Title VII.

Under the present law, an employer may adopt or be ordered to adopt racially discriminatory hiring or promotion practices favoring actual or putative employees of a particular race only as a remedy for its own prior discriminatory practices disfavoring members of that race. The Court's opinion pays scant attention to this necessary predicate for race-conscious practices, whether judicially imposed or voluntarily adopted, favoring one race over another. Instead, the Court seeks to avoid the issue whether the consent decree at issue violates the Title VII rights of nonminority employees by limiting itself to holding that § 706(g), which deals with remedies for violations of Title VII, has no application whatsoever to agreements and consent decrees such as are involved in this case. In so doing, the Court not only ignores the fact that the intervenor in this case has never restricted its claims to those based on § 706(g), see Pet. for Cert. 7, but also adopts an unduly restricted view of the place of § 706(g) in the statute.

The Court purports to find support for its position in *Steelworkers* v. *Weber*, 443 U. S. 193 (1979), but this is not my understanding of that case. There, it was clear that the company had been hiring only those craftworkers with prior experience and that the craft unions had excluded blacks. Hence, the company's craftworkers were almost totally white. The company and the union negotiated a contract to break this discriminatory pattern, and we held that there was no violation of Title VII. But the company's prior discriminatory conduct provided the predicate for a temporary remedy favoring black employees. The *Weber* opinion

stated that the agreement was a voluntary, private, race-conscious effort to abolish traditional patterns of segregation and hierarchy, *id.*, at 204, and held that the agreement was not an undue attempt to overcome these racial barriers. The case did not hold that without such a predicate, an employer, alone or in agreement with the union, may adopt race-conscious hiring practices without violating Title VII.

Under current law, an employer who litigates a Title VII case to judgment cannot lose unless it is proved that it has discriminated within the meaning of § 703. It is therefore untenable to conclude, as the Court does, that a district court may nevertheless enter a consent decree ordering an employer to hire or promote on a racial basis in a way that could not be ordered after a contested trial. Title VII was not enacted to protect employers against themselves, but to protect applicants and employees from racially discriminatory practices. There is no statutory authority for concluding that if an employer desires to discriminate against a white applicant or employee on racial grounds he may do so without violating Title VII but may not be ordered to do so if he objects. In either case, the harm to the discriminatee is the same, and there is no justification for such conduct other than as a permissible remedy for prior racial discrimination practiced by the employer involved. The Court should not deprecate that requirement and in effect make Title VII's proscription a one-way racial street, thus disserving the goal of ending racial discrimination in this country.

I agree with JUSTICE REHNQUIST that the consent decree in this case was not immune from examination under § 706(g). I also agree with JUSTICE BRENNAN's opinion in *Sheet Metal Workers* v. *EEOC, ante,* p. 421, that in Title VII cases enjoining discriminatory practices and granting relief only to victims of past discrimination is the general rule, with relief for nonvictims being reserved for particularly egregious conduct that a district court concludes cannot be cured by injunctive relief alone. I disagree, however, with the Court in this case

that we need not decide whether the remedy conforms to the limitations of § 706(g); and for the reasons stated below, I am convinced that the remedy imposed in this case exceeds the limits of a permissible remedy for the discriminatory practices that were recited in the consent decree and that required a remedy consonant with the provisions of Title VII. Even if I agreed that § 706(g) is beside the point in the case, the Court itself concedes that there are limits to the racial discrimination that an employer and a union may voluntarily visit upon nonminorities, *ante,* at 520–521, n. 10, and those limits, which in my view run parallel to those placed on judicial decrees by § 706(g), are exceeded in this case.

This case primarily concerns promotions in the Cleveland Fire Department. Reciting that there had been discrimination against minorities in promotions, but identifying no actual victims of such discrimination, the decree required that those proved eligible for promotion after examination be divided into two lists, one list comprising minority eligibles and one list made up of nonminority eligibles. Promotions were to proceed two at a time, one from the minority list and one from the nonminority roster. Of course, the names on each list were ranked in accordance with seniority and examination results. It is also evident, and it is conceded, that under the decree minority eligibles would be promoted who would not have been promoted had the lists been merged; that is, black and Hispanic firefighters who would have ranked below white firefighters eligible for promotion actually displaced and were preferred over the latter on a strictly racial basis. This kind of leapfrogging minorities over senior and better qualified whites is an impermissible remedy under Title VII, just as in *Firefighters* v. *Stotts,* 467 U. S. 561 (1984), laying off senior whites was an excessive remedy for an employer's prior discrimination, and just as in *Wygant* v. *Jackson Board of Education,* 476 U. S. 267 (1986), the Equal Protection Clause did not require or permit the layoff of white teachers

in order to maintain a particular racial balance in the work force.

Section 706(g) provides in part:

> "If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate." 42 U. S. C. § 2000e–5(g).

None of the racially preferred blacks in the present case was shown to have been a victim of discriminatory promotion practices; and none of the whites denied promotion was shown to have been responsible or in any way implicated in the discriminatory practices recited in the decree. In view of the burdens placed on nonminority employees by the decree, the remedy imposed was inequitable, could not have been ordered after a trial, and is no more valid when agreed to by the employer but contested by those who claim their right not to be discriminated against on racial grounds.

JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE joins, dissenting.

Petitioner challenges a District Court decree that ordered preferential treatment in promotions for minority firefighters at the expense of nonminority firefighters who would have been promoted under the City's existing seniority system. There was no requirement in the decree that the minority beneficiaries have been victims of the City's allegedly discriminatory policies. One would have thought that this question was governed by our opinion only two Terms ago in

*Firefighters* v. *Stotts*, 467 U. S. 561, 578–579 (1984), in which we said:

> "If individual members of a plaintiff class demonstrate that they have been actual victims of the discriminatory practice, they may be awarded competitive seniority and given their rightful place on the seniority roster. This much is clear from *Franks* v. *Bowman Transportation Co.*, 424 U. S. 747 (1976), and *Teamsters* v. *United States*, [431 U. S. 324 (1977)]. *Teamsters*, however, also made clear that mere membership in the disadvantaged class is insufficient to warrant a seniority award; each individual must prove that the discriminatory practice had an impact on him. . . . Here, there was no finding that any of the blacks protected from layoff had been a victim of discrimination and no award of competitive seniority to any of them. Nor had the parties in formulating the consent decree purported to identify any specific employee entitled to particular relief other than those listed in the exhibits attached to the decree. It therefore seems to us that in light of *Teamsters*, the Court of Appeals imposed on the parties as an adjunct of settlement something that could not have been ordered had the case gone to trial and the plaintiffs proved that a pattern or practice of discrimination existed."

But a majority of the Court today holds that the District Court properly entered the decree in this case because it was a consent decree, whereas *Stotts* involved the *modification* of a consent decree. The Court apparently views a consent decree as one which may be structured almost entirely by the parties, even though the statute which the decree enforces may not authorize any such relief, and, indeed, may actually prohibit such relief.

To support its distinction of a "consent decree" from other types of decrees, the Court finds it necessary to implicitly repudiate language in the two of our cases most closely in

point —*Stotts, supra,* and *Railway Employees* v. *Wright,* 364 U. S. 642 (1961), in favor of citations to cases that simply do not speak to the question presently before us, or to cases that deal only with the question whether a party that has consented to a decree may nonetheless challenge it. For the decree entered by the District Court in this case was a consent decree only between Vanguards of Cleveland, an organization of black and Hispanic firefighters employed by the City of Cleveland, and the City; the petitioner union, representing the majority of firefighters, never consented to the decree at all. And the Court's suggestion in Part IV of its opinion that "the consent decree entered here does not bind Local 93 to do or not to do anything," *ante,* at 529–530, verges on the pharisaical; the decree *does* bind the City of Cleveland to give preferential promotions to minority firefighters who have not been shown to be the victims of discrimination in such a way that nonminority union members who would otherwise have received these promotions are obviously injured.

In *Firefighters* v. *Stotts, supra,* at 576, n. 9, the Court said:

> "'[T]he District Court's authority to adopt a consent decree comes only from the statute which the decree is intended to enforce,' not from the parties' consent to the decree. *Railway Employees* v. *Wright,* 364 U. S. 642, 651 (1961)."

The observations of Justice Harlan's opinion for the Court in *Railway Employees* v. *Wright, supra,* can best be understood when set forth more fully than it was in *Stotts:*

> "In a case like this the District Court's authority to adopt a consent decree comes only from the statute which the decree is intended to enforce. Frequently of course the terms arrived at by the parties are accepted without change by the adopting court. But just as the adopting court is free to reject agreed-upon terms as not in furtherance of statutory objectives, so must it be free to

modify the terms of a consent decree when a change in law brings those terms in conflict with statutory objectives. In short, it was the Railway Labor Act, and only incidentally the parties, that the District Court served in entering the consent decree now before us." 364 U. S., at 651.

The Court simply ignores the statements in *Stotts* and *Wright*, in favor of bare citations to various other cases and a commentator. But when we ask precisely what these "other cases" say about the issue presented in this case, the answer is virtually nothing. No one would dispute that a consent decree requires the consent of the parties, and that a consent decree may be an effective way to settle a lawsuit. See, *e. g., Carson* v. *American Brands, Inc.*, 450 U. S. 79, 88, n. 14 (1981); *United States* v. *ITT Continental Baking Co.*, 420 U. S. 223, 235–237 (1975); *United States* v. *Armour & Co.*, 402 U. S. 673 (1971). But the Court's excerpt from Moore's Federal Practice, *ante*, at 525, does not aid its conclusions, and is in fact quite misleading in what it fails to include; the full sentence from Moore's reads thus:

"But the fact remains that the judgment is not an *inter partes* contract; the Court is not properly a recorder of contracts, but is an organ of government constituted to make judicial decisions and when it has rendered a consent judgment it has made an adjudication." 1B J. Moore, J. Lucas, & T. Currier, Moore's Federal Practice ¶ 0.409[5], pp. 330–331 (1984).

The two prior cases principally relied upon by the Court are *Pacific R. Co.* v. *Ketchum*, 101 U. S. 289 (1880), and *Swift & Co.* v. *United States*, 276 U. S. 311 (1928). No language from either of these cases is quoted to explain their citation for the proposition that "a federal court is not necessarily barred from entering a consent decree merely because the decree provides broader relief than the court could have awarded after a trial." *Ante*, at 525. *Ketchum* was an

equity receivership case in federal court only by reason of diversity of citizenship, and there was no question of a federal statute or federal policy to be enforced other than the policy of hearing and deciding cases in which the parties could show diversity jurisdiction. The long and short of the Court's discussion of consent decrees in *Swift & Co., supra,* is that while some of the paragraphs of a decree might be objectionable if they had been challenged on appeal, "the defendants by their consent lost the opportunity of raising the question on appeal." 276 U. S., at 328. Here, of course, petitioner intervened in the District Court pursuant to Federal Rule of Civil Procedure 24(a), and never in any way consented to the entry of the decree.*

Thus the Court abandons considered and repeated observations in *Stotts* and *Wright,* not because they are inconsistent with any cases recognizing that parties may agree in a

---

*The Court asserts that a three-party dispute may be ended by consent decree even if one of the parties refuses to tender his consent. *Ante,* at 528–530. It cites *Zipes* v. *Trans World Airlines, Inc.,* 455 U. S. 385 (1982), and *Kirkland* v. *New York State Dept. of Correctional Services,* 711 F. 2d 1117 (CA2 1983), cert. denied, 465 U. S. 1005 (1984), for this novel proposition. But neither of these cases make statements anywhere as broad as the proposition for which they are cited. *Zipes* involved a union that was "permitted" to intervene nine years after the litigation had commenced, after a judgment on liability had been entered and affirmed, and just before a settlement on the remedy was reached. See 455 U. S., at 388–391. *Kirkland* involved permissive intervention under Federal Rule of Civil Procedure 24(b), see 711 F. 2d, at 1124, which of course raises significantly different equitable concerns from intervention as of right. An intervenor as of right becomes a party to the action because "the disposition of the action may as a practical matter impair or impede his ability to protect that interest," Fed. Rule Civ. Proc. 24(a), whereas a permissive intervenor typically becomes a party only to ward off the potential effects of *stare decisis.* The question whether a party or an intervenor as of right may block the entry of a consent decree is therefore left unresolved by these cases. Of course, *a judicial decree* to which the parties agree may be entered over the objections of an intervenor as of right; but the question is whether such a decree is properly called a "consent decree" or a coercive court order.

consent decree to relief broader than a court would otherwise be authorized to impose, but because the statements in *Wright* and *Stotts* are inconsistent with the result which the Court is apparently determined to reach in this case. I would adhere to these well-considered observations, which properly restrain the scope of a consent decree to that of implementation of the federal statute pursuant to which the decree is entered.

Even if I did not regard the above-quoted language in *Stotts* as controlling, I would conclude—just as five Members of this Court did only two years ago in another passage from *Stotts*—that § 706(g) bars the relief which the District Court granted in this case. The critical language of § 706(g)— which is the only section of Title VII dealing with the Court's remedial authority—is:

> "No order of the Court shall require the . . . promotion of an individual . . . if such individual was refused . . . advancement . . . for any reason other than discrimination on account of race, color, religion, sex, or national origin . . . ."

The Court today concludes that this language simply "does not restrict the ability of employers or unions to enter into voluntary agreements providing for race-conscious remedial action." *Ante*, at 521. This conclusion rests on the premise that the overriding policy behind § 706(g) is to prevent courts from unduly interfering with the managerial discretion of employers or unions. Focusing on this single policy, the Court finds it natural to conclude that § 706(g) was intended *not* to apply to consent decrees to which an employer consents. But this construction flies in the face of the language just quoted, which by its terms deals with *any* "order" of the Court in a Title VII case. It also conflicts with the legislative history cited in *Stotts* which shows that § 706(g) serves the additional policy of protecting innocent nonminority em-

ployees from the evil of court-sanctioned racial quotas.    In *Stotts*, 467 U. S., at 579–582, and nn. 12–15, we said:

"Our ruling in *Teamsters* that a court can award competitive seniority only when the beneficiary of the award has actually been a victim of illegal discrimination is consistent with the policy behind § 706(g) of Title VII, which affects the remedies available in Title VII litigation.[12] That policy, which is to provide make-whole relief only to those who have been actual victims of illegal discrimination, was repeatedly expressed by the sponsors of the Act during the congressional debates.    Opponents of the legislation that became Title VII charged that if the bill were enacted, employers could be ordered to hire and promote persons in order to achieve a racially balanced work force even though those persons had not been victims of illegal discrimination.[13]    Responding to

"[12] Section 706(g) provides: 'If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay . . . or any other equitable relief as the court deems appropriate. . . . No order of the court shall require the admission or reinstatement of an individual as a member of a union or the hiring, reinstatement, or promotion of an individual as an employee, or the payment to him of any back pay, if such individual was refused admission, suspended, or expelled, or was refused employment or advancement or was suspended or discharged for any reason other than discrimination on account of race, color, religion, sex, or national origin or in violation of § 704(a) of this title.'    86 Stat. 107, 42 U. S. C. § 2000e–5(g).

"[13] See H. R. Rep. No. 914, 88th Cong., 1st Sess., 72–73 (1963) (minority report); 110 Cong. Rec. 4764 (remarks of Sen. Ervin and Sen. Hill); *id.*, at 5092, 7418–7420 (remarks of Sen. Robertson); *id.*, at 8500 (remarks of Sen. Smathers); *id.*, at 9034–9035 (remarks of Sen. Stennis and Sen. Tower).

these charges, Senator Humphrey explained the limits on a court's remedial powers as follows:

"'No court order can require hiring, reinstatement, admission to membership, or payment of back pay for anyone who was not fired, refused employment or advancement or admission to a union by an act of discrimination forbidden by this title. This is stated expressly in the last sentence of section 707(e) [enacted without relevant change as § 706(g)] . . . . Contrary to the allegations of some opponents of this title, there is nothing in it that will give any power to the Commission or to any court to require . . . firing . . . of employees in order to meet a racial "quota" or to achieve a certain racial balance. That bugaboo has been brought up a dozen times, but it is nonexistent.' 110 Cong. Rec. 6549 (1964).

"An interpretative memorandum of the bill entered into the Congressional Record by Senators Clark and Case[14] likewise made clear that a court was not authorized to give preferential treatment to nonvictims. 'No court order can require hiring, reinstatement, admission to membership, or payment of back pay for anyone who was not discriminated against in violation of [Title VII]. This is stated expressly in the last sentence of section [706(g)] . . . .' Id., at 7214.

"Similar assurances concerning the limits on a court's authority to award make-whole relief were provided by supporters of the bill throughout the legislative process. For example, following passage of the bill in the House, its Republican House sponsors published a memorandum describing the bill. Referring to the remedial powers given the courts by the bill, the memorandum stated: 'Upon conclusion of the trial, the Federal court may en-

"[14] Senators Clark and Case were the bipartisan 'captains' of Title VII. We have previously recognized the authoritative nature of their interpretative memorandum. *American Tobacco Co.* v. *Patterson*, 456 U. S. 63, 73 (1982); *Teamsters* v. *United States*, 431 U. S. 324, 352 (1977).

join an employer or labor organization from practicing further discrimination and may order the hiring or reinstatement of an employee or the acceptance or reinstatement of a union member. *But title VII does not permit the ordering of racial quotas in businesses or unions . . . .'* *Id.*, at 6566 (emphasis added). In like manner, the principal Senate sponsors, in a bipartisan newsletter delivered during an attempted filibuster to each Senator supporting the bill, explained that '[u]nder title VII, not even a court, much less the Commission, could order racial quotas or the hiring, reinstatement, admission to membership or payment of back pay for anyone who is not discriminated against in violation of this title.' *Id.*, at 14465.[15]"

" [15] The dissent suggests that Congress abandoned this policy in 1972 when it amended § 706(g) to make clear that a court may award 'any other equitable relief' that the court deems appropriate. [467 U. S.], at 619–620. As support for this proposition the dissent notes that prior to 1972, some federal courts had provided remedies to those who had not proved that they were victims. It then observes that in a section-by-section analysis of the bill, its sponsors stated that 'in any areas where a specific contrary intention is not indicated, it was assumed that the present case law as developed by the courts would continue to govern the applicability and construction of Title VII.' 118 Cong. Rec. 7167 (1972).

"We have already rejected, however, the contention that Congress intended to codify all existing Title VII decisions when it made this brief statement. See *Teamsters, supra,* at 354, n. 39. Moreover, the statement on its face refers only to those sections not changed by the 1972 amendments. It cannot serve as a basis for discerning the effect of the changes that were made by the amendment. Finally, and of most importance, in a later portion of the same section-by-section analysis, the sponsors explained their view of existing law and the effect that the amendment would have on that law.

" 'The provisions of this subsection are intended to give the courts wide discretion exercising their equitable powers to fashion the most complete relief possible. In dealing with the present § 706(g) *the courts have stressed that the scope of relief under that section of the Act is intended to make the victims of unlawful discrimination whole,* and that the attainment of this objective rests not only upon the elimination of the particular unlawful employment practice com-

plained of, but also requires that *persons aggrieved by the consequences and effects of the unlawful employment practice* be, so far as possible, restored to a position where they would have been were it not for the unlawful discrimination.' 118 Cong. Rec., at 7168 (emphasis added).

"As we noted in *Franks*, the 1972 amendments evidence 'emphatic confirmation that federal courts are empowered to fashion such relief as the particular circumstances of a case may require to effect restitution, making whole insofar as possible *the victims of racial discrimination.*' 424 U. S., at 764 (emphasis added)."

The Court today repeats arguments made by the dissenters in *Stotts*, which did not command a majority two years ago, and also suggests that a restriction such as § 706(g) should apparently be narrowly construed because, if it were to limit the authority of the court to enter a consent decree, it might hinder settlement of some cases. It would be just as sensible to say that the Norris-LaGuardia Act should be narrowly construed so as not to prevent a consent decree which would violate the Norris-LaGuardia Act since more consent decrees might be entered under that construction of the statute. Congress undoubtedly expressed a preference for conciliation in cases arising under Title VII, but not conciliation reached by violation of its express statutory commands.

Legislative history can obviously be mustered in support of the Court's interpretation of § 706(g), just as *Stotts* referred to the legislative history supporting the construction adopted in that case. But while the legislative history may be fairly apportioned among both sides, the language of the statutes is clear. *No order of the Court* shall require promotion of an individual whose failure to receive promotion was for a reason other than discrimination prohibited by the statute. Here the failure of the District Court to make any finding that the minority firefighters who will receive preferential promotions were the victims of racial discrimination requires us to conclude on this record that the City's failure to advance them was *not* "on account of race, color, religion, sex, or national origin."

Section 706(g) is the one section in the entire text of Title VII which deals with the sort of relief which a court may order in a Title VII case; it is simply incredible that the Court today virtually reads it out of existence. Surely an order of the court entered by the consent of the parties does not become any less an order of the court; in the very words of the sentence quoted by the Court from 1B J. Moore, J. Lucas, & T. Currier, Moore's Federal Practice ¶ 0.409[5], pp. 330–331 (1984):

> "[T]he fact remains that the judgment is not an *inter partes* contract; the court is not properly a recorder of contracts, but is an organ of government constituted to make judicial decisions and when it has rendered a consent judgment it has made an adjudication."

Just as it has made an adjudication, it has also entered an order, and that order is by definition subject to the prohibitions of § 706(g).